REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1499

September Term, 2014

_____

TIMOTHY BROOKS, ET AL.

v.

ROGER JENKINS, ET UX.

_____

Berger,
Nazarian,
Eldridge, John C.*
       (Retired, Specially Assigned),

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  December 16, 2014

* Judge Eldridge participated in the argument of
this case but did not participate in the decision.

This case began as a seemingly simple arrest warrant, but went very wrong in the execution. Frederick County Sheriff deputies Timothy Brooks and Nathan Rector (the "Deputies")[1] went to the home of Roger and Sandra Jenkins, warrant in hand, to arrest their son. Mr. Jenkins answered the door and sought to cooperate, among other ways by moving the family dogs from the house to an outside kennel. The events that followed are a matter of considerable dispute, but the undisputed result was that Deputy Brooks shot and wounded their chocolate Labrador Retriever, Brandi. Then, when Mr. and Mrs. Jenkins left the house to take Brandi to the vet, the Deputies entered the house—contrary, Mr. Jenkins testified, to his express instructions—found the son hiding behind a door, and arrested him.

The Jenkinses filed a complaint in the Circuit Court for Frederick County seeking damages, on a number of theories, for the wounding of the dog and the officers' alleged unlawful entry into their home. The counts in the complaint contain overlapping claims alleging both constitutional and common-law causes of action. After a trial, both the Jenkinses prevailed against both of the Deputies and the jury awarded damages totaling $620,000 (reduced, after *remittitur*, to $607,500). The Deputies appeal.

We conclude that the trial court properly permitted the Jenkinses' constitutional tort claims arising from the dog shooting to go to the jury and properly declined to apply Md.

---

[1] Because the State of Maryland was also a named party, we will refer collectively to all three, as appropriate, as "the defendants," although the State is not a party to this appeal.

Code (1974, 2013 Repl. Vol.), § 11-110 of the Courts & Judicial Proceedings Article ("CJ"), which caps recovery for tortious injuries to pets, to reduce the total available damages on those counts to $7,500. We find as well that the jury verdict on the shooting claims was not excessive. But we reach a different result for the trespass counts. We hold that the jury's finding that the Deputies acted with neither gross negligence nor malice entitled the Deputies to immunity on the Jenkinses' constitutional trespass claim. We also hold that the Jenkinses could not, as a matter of law, recover mental anguish damages, but could recover only nominal damages for common law trespass, even though the jury found on that count that the Deputies acted with gross negligence. We affirm in part, reverse in part, and remand.

## I. BACKGROUND

### A. Events at the Jenkins Home

On January 9, 2010, the Deputies went to the Jenkinses' home to serve a writ of body attachment on their eighteen-year-old son, Jared, in connection with an incident that took place while Jared was a minor. Deputy Brooks left his patrol car running, so the camera inside it kept recording.[2]

Mr. Jenkins woke up at about 7:00 a.m. to hear Deputy Brooks "banging" on the door. When Deputy Brooks told him the purpose of his visit, Mr. Jenkins responded that

---

[2] The camera recorded most of the events that followed without any sound; the audio came on after Brandi had been shot and was lying in Mrs. Jenkins's lap.

2

he didn't know whether Jared had come home the night before, but that before they spoke further, he would move the barking dogs from the house to an outdoor kennel. Mr. Jenkins walked out the rear of the house, apparently expecting the dogs to walk with him out the door, across the driveway, and to the garage. He headed to the back door with Brandi ahead of him by about six to eight feet. He did not put her on a leash; he explained in response to his counsel's question at trial that it did not occur to him that Brandi might act aggressively toward any officer:

> It certainly didn't. If I . . . thought that . . . there was going to be any issues I would not have let my dog just . . . walk out the door as I did, and there was no concern of mine that my dog was going to be shot, for one, or there's going to be [any] aggression.

When Mr. Jenkins saw Brandi turn the corner ahead of him, he called her to come. But as he walked up the side of the house, he heard a gunshot, and as he continued up the driveway, he realized that Deputy Brooks had shot Brandi. Mrs. Jenkins came out of the house and sat with Brandi while her husband went inside, got towels to put on Brandi, and called the vet.

Not surprisingly, Deputy Brooks's perspective differed greatly from Mr. Jenkins's.[3] He testified that he backed away from Brandi, but she continued coming at him. Although

---

[3] As it turns out, this was not Deputy Brooks's first encounter with a dog. Several months before, Deputy Brooks had used a taser on two dogs while he was on duty. He went to a home for a witness interview and was confronted by at least two dogs, a "Rottweiler mix" and a "very small Poodle." It seems that the dogs were running around the front yard of

Deputy Brooks agreed that the dog never got closer to him than three feet away, he testified that he believed that she was on the attack:

> [T]he dog was . . . barking loudly and coming in . . . a pretty determined pace. It was the sound of this dog as well as the sound that he was making on the inside [of the house previously], and the aggressive and agitated nature when I had seen him on the inside so I took a couple steps back at that point to create distance in case that dog came around the corner, and . . . came after me.

In response, Deputy Brooks pulled his gun from the holster and fired it in the direction of Brandi's chest.

About three-and-a-half minutes elapsed from the time Deputy Brooks knocked on the front door until he shot Brandi. About eight minutes later, Mr. and Mrs. Jenkins left to take Brandi to the vet. Mr. Jenkins testified that before they left, he instructed the Deputies (in more colorful language) not to enter his house.

Deputy Brooks, on the other hand, testified that he heard no such instruction. After Mr. and Mrs. Jenkins left, the Deputies awaited the arrival of their supervisor, Corporal Michael Easterday. As they waited, though, they decided that they should go inside because they had not yet secured the area and they "potentially [had an] unaccounted [for] wanted person right here." Deputy Rector went in and announced himself, and they located Jared behind a door. Corporal Easterday arrived, and a third deputy took Jared to patrol

---

the home and Deputy Brooks aimed his taser at the Rottweiler mix (apparently thinking it was coming at him), but hit both that dog *and* the poodle.

4

headquarters. Mr. and Mrs. Jenkins returned to the house during Brandi's surgery, and, according to Mr. Jenkins, "nothing seemed to be disturbed." Mr. Jenkins offered detailed testimony about picking up Brandi the next day, tending to her injuries, and the effect the incident has had on his family.

**B.      Pleadings and trial (through defendants' motions for judgment)**

The Jenkinses filed suit in a twelve-count complaint on October 25, 2010.  The following counts against Deputies Brooks and Rector survived pre-trial motions:

Count 2: Trespass to Property (for entry into the home)

Count 3: Trespass to Chattel (for shooting Brandi)

Count 5: Violation of Md. Const. Art. 24 (for shooting Brandi)

Count 6: Violation of Md. Const. Art. 24 (for illegal entry into the home)

Count 7: Violation of Md. Const. Art. 26 (for illegal entry into the home)

Count 8: Intentional Infliction of Emotional Distress (for shooting Brandi)

At trial, the Jenkinses called various members of the family to testify, along with Deputies Brooks and Rector.  The veterinarian who treated Brandi also testified.

At the close of the Jenkinses' case, the Deputies moved for judgment as a matter of law. They argued that Count 6 improperly sought recovery for the Deputies' trespass into the Jenkins house under Article 24 of the Maryland Constitution, when the proper claim

5

existed only under Article 26 (on which Count 7 was premised).[4] They argued that Article 24 applied to an allegedly improper use-of-force claim (and analogized to the Fifth Amendment to the United States Constitution), whereas Article 26 applied when an unlawful search was at issue (analogizing to the Fourth Amendment).[5] According to counsel, the "hallmark of liability under Article 26 is reasonableness[, w]hereas the hallmark of liability under Article 24 is . . . arbitrary capricious conduct, shocks the conscious [sic] conduct, um, abuse of governmental authority." The Deputies argued as

---

[4] Article 24 of the Maryland Declaration of Rights provides:

> [t]hat no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land.

Article 26 provides:

> [t]hat all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted.

[5] The transcript leaves some question as to how the Deputies viewed the relationship between the federal and Maryland constitutional claims: "The two provisions, that is State and Federal, are not exactly the same, the Court of Appeals has made that clear, but the Court of Appeals has not indicated that in any way material to this case, they're not the same."

well that the Jenkinses had failed to establish facts that would have permitted the jury to find that Deputy Brooks acted with gross negligence when he shot Brandi.

The court denied the motion as to both the trespass claims and to the claims arising from the shooting.[6] The court likewise denied the State's motion for judgment with respect to the negligence claims. The defense did not present any witnesses. The jury deliberated for about four hours, then returned with a verdict that made the following findings and awards (which we have paraphrased from the long verdict form—the emphases are ours):

## DEPUTY BROOKS

Liability

- Deputy Brooks "**violated** [the Jenkinses'] State **constitutional rights" by shooting Brandi**, and acted **with gross negligence** but **without actual malice**. *(Questions 1-3; Count 5)*
- Deputy Brooks "committed a **trespass to chattels** by **shooting" Brandi**, and acted **with gross negligence** but **without actual malice**. *(Questions 10-12; Count 3)*
- Deputy Brooks "**violated** [the Jenkinses'] State **constitutional rights**" by entering the home, but acted **without gross negligence or actual malice**. *(Questions 4-6; Counts 6 & 7)*
- Deputy Brooks **trespassed onto** the Jenkinses' **property** "by entry into the home," and acted **with gross negligence** but **without actual malice**. *(Questions 7-9; Count 2)*

Damages
- For the shooting
     - to Roger Jenkins:
          $10,000 economic damages
          $100,000 non-economic damages

---

[6] The court granted the motion as to Count 8, for intentional infliction of emotional distress. The State also moved for judgment on the Jenkinses' negligence claim against it, and the court denied it.

- to Sandra Jenkins:
$10,000 economic damages
$100,000 non-economic damages

- For entry into the home
    - to Roger Jenkins:
    $100,000
    - to Sandra Jenkins:
    $100,000

## DEPUTY RECTOR

### Liability

- Deputy Rector "**violated** [the Jenkinses'] State **constitutional rights**" by entering the home, but acted **without gross negligence or actual malice**. *(Questions 18-20; Counts 6 & 7)*
- Deputy Rector **trespassed onto** the Jenkinses' **property** "by entry into the home," and acted **with gross negligence** but **without actual malice**. *(Questions 21-23; Count 2)*

### Damages
- For entry into the home
    - to Roger Jenkins:
    $100,000 non-economic damages
    - to Sandra Jenkins:
    $100,000 non-economic damages

### C.     Post-verdict

The Deputies moved for judgment notwithstanding the verdict or, alternatively for a new trial or *remittitur,* and argued six specific grounds: (1) the evidence was insufficient to support the jury's finding that Deputy Brooks acted with gross negligence in shooting Brandi; (2) the evidence was insufficient to support the jury's finding that the Deputies acted with gross negligence in entering the home, and therefore they were entitled to statutory immunity; (3) there was no basis on which to award non-economic damages for

8

the shooting; (4) the $20,000 award for *economic* damages arising from the shooting exceeded the statutory cap for damages arising from injuries to pets; (5) the total award of $400,000 erroneously permitted "separate damages . . . against separate Defendants for a single event"; and (6) "all damages awarded were excessive." They also claimed broadly that "deficiencies in the jury instructions and the verdict sheet . . . in the absence of j.n.o.v. or remittitur, can only be cured by a new trial."

After a hearing, the court denied the requested relief except that the court applied CJ § 11-110 and reduced the economic damages relating to Brandi's injuries from $20,000 to $7,500. The court then entered an Order of Final Judgment that included judgment against Deputy Brooks in favor of Sandra Jenkins for $203,750; against Deputy Brooks in favor of Roger Jenkins for $203,750; against Deputy Rector in favor of Sandra Jenkins for $100,000; and against Deputy Rector in favor of Roger Jenkins for $100,000. The Deputies filed a timely notice of appeal.

## II. DISCUSSION

This case requires us to chart the often-fuzzy boundary between the Deputies' undeniable right to stay safe as they discharge their duties, on the one hand, and the Jenkinses' constitutional rights to be free in their home from excessive force and intrusion, on the other. That boundary is blurred even more than usual in this case by the fact that

the shooting victim was the family dog rather than a human member of the Jenkins family,[7] a fact far less important to our analysis than the Deputies and *amici*[8] contend. Instead, as framed by the claims pled and tried, our analysis of the multiple counts, multiple damages awards, and multiple issues on appeal[9] revolves fundamentally around *Mr. and Mrs.*

---

[7] We note, though, at least two high-profile, police-involved injuries to dogs in the past year. *See* Justin George, *Officer charged with killing dog set out to 'gut' it, witnesses said*, The Baltimore Sun (June 19, 2014), http://articles.baltimoresun.com/2014-06-19/news/ bs-md-ci-police-dog-killing-20140618_1_animal-cruelty-dog-officers-baltimore-police-officer-shot (recounting witnesses' accounts that a police officer viciously slit the throat of a Sharpei that had been contained and posed no threat to the officer); Colin Campbell & Tim Swift, *Arundel Police Officer Kills Family's Dog During Search*, The Baltimore Sun (February 3, 2014), http://articles.baltimoresun.com/2014-02-02/news/bs-md-officer-kills-dog-20140202_1_ police-officer-community-dog-park-keith-elgin (where the police officer canvassing a neighborhood in search of witnesses stood accused of shooting a family's dog, claiming he was "confronted" by the Chesapeake Bay Retriever in the family's front yard); Radley Balko, *Maryland Cop Kills Dog*, The Washington Post (February 3, 2014), http:// www.washingtonpost.com/news/opinions/wp/2014/02/03/ maryland-cop-kills-dog (noting the same incident and the increase of such incidents in Maryland and nationwide in recent years).

[8] We have received and reviewed three briefs *amici curiae* in this case. *See* Maryland Rule 8-511. *First*, a group of pet and veterinary organizations (to which we refer as the "MVMA *amici*") filed a brief in support of Deputies Brooks and Rector or, more precisely, contending that we should reverse or reduce the damages award relating to the dog shooting. This group includes the Maryland Veterinary Medical Association; the American Kennel Club; the Cat Fanciers' Association; the Animal Health Institute; the American Veterinary Medical Association; the National Animal Interest Alliance; the American Pet Products Association; the American Animal Hospital Association; and the Pet Industry Joint Advisory Council. *Second*, the Animal Legal Defense Fund ("ALDF") and Maryland Animal Law Center ("MALC") filed briefs *amici curiae* in support of the Jenkinses or, more precisely, a decision to affirm the damages award. We address their arguments in our discussion of Md. Code (1974, 2013 Repl. Vol.), § 11-110 of the Courts & Judicial Proceedings Article ("CJ").

[9] The Deputies present the following questions for our review:

*Jenkinses'* rights and the injuries *they* suffered (or, with regard to the trespass claims, didn't

suffer) and the Deputies' mental states at the time they acted. Brandi is not irrelevant, of

course, but her injuries comprise a comparatively small portion of the overall award, and

---

<table>
<tr><td>I.</td><td>Whether the evidence was sufficient to submit the issue of gross negligence as to the wounding of the dog to the jury?</td></tr>
<tr><td>II.</td><td>Whether the trial court erred by permitting a damages award in excess of the statutory cap on compensatory damages for tortious injury to a pet?</td></tr>
<tr><td>III.</td><td>Whether the trial court erred by permitting mental anguish damages arising from harm to personal property in the absence of fraud, malice or like motives?</td></tr>
<tr><td>IV.</td><td>Whether the trial court erred by denying [the Deputies] the immunity from liability they enjoy under the MTCA where the jury found the alleged constitutional violation for entry into the residence was performed without malice and without gross negligence?</td></tr>
<tr><td>V.</td><td>Whether the trial court erred by permitting an irreconcilably inconsistent verdict to stand?</td></tr>
<tr><td>VI.</td><td>Whether the trial court erred by permitting [Mr. and Mrs. Jenkins] each . . . to recover twice for the indivisible harm of entry into the home?</td></tr>
<tr><td>VII.</td><td>Whether the trial court erred by denying [the Deputies] motion for remittitur on the award of damages?</td></tr>
<tr><td>VIII.</td><td>Whether the trial court erred by conflating claims under Article 24 and Article 26 of the Maryland Declaration of Rights?</td></tr>
</table>

we hold that the Maryland pet tort statute plays a correspondingly small role in the ultimate damages calculus.

### A. The Trial Court Properly Permitted The Jury To Consider Whether Deputy Brooks Was Grossly Negligent When He Shot Brandi.

Deputy Brooks argues *first* that the trial court improperly denied his motion for judgment with respect to the Jenkinses' claim that he violated their constitutional rights (under Count 3) and committed a trespass to chattel (Count 5) when he shot Brandi. We examine "whether the evidence was legally sufficient to permit the judge, as a matter of law, to submit the case to the jury." *Starke v. Starke*, 134 Md. App. 663, 677 (2000). That is, we ask: "[i]s there some evidence in the case, including all inferences that may permissibly be drawn therefrom, that, if believed and if given maximum weight, could logically establish all of the elements necessary to prove" the elements of the claim? *Id.* at 678-79. We view the evidence in the light most favorable to the prevailing party (here, the Jenkinses), and "the quantum of legally sufficient evidence needed to create a jury question is slight." *Univ. of Md. Med. Sys. Corp. v. Gholston*, 203 Md. App. 321, 329, *cert. denied*, 427 Md. 65 (2012) (citation omitted); *see also Espina v. Prince George's Cnty.*, 215 Md. App. 611, 655-56 (2013) (finding sufficient evidence to support a jury verdict of actual malice to preclude officer from invoking statutory immunity, where evidence showed that police officer attacked victim unprovoked, shooting and killing him when he was "unable to resist or fight back"), *cert. granted*, 438 Md. 142 (May 16, 2014).

12

Deputy Brooks argues that the evidence did not support a finding of gross negligence, and without that finding he was acting within the scope of his employment "throughout the event" and, therefore, entitled to statutory immunity under the Maryland Tort Claims Act (the "MTCA"). *See generally* Md. Code (1984, 2009 Repl. Vol.), § 12-104(b) of the State Government Article ("SG"); *see also* CJ § 5-522(a) (establishing between the two sections the State's immunity from suit for a state employee who has acted within the scope of employment but without gross negligence or actual malice). He points us to *Boyer v. State*, 323 Md. 558 (1991), in which the Court of Appeals found insufficient evidence of gross negligence where two individuals died after a police officer pursued a drunk driver who ultimately killed two people. *Id.* at 563. As he sees the facts, an "aggressive" dog ran toward him and he had "seven to eight seconds" to decided what to do about it; he claims that his decision to shoot Brandi was so far below the standard in *Boyer* that as a matter of law, no rational jury could have found him grossly negligent. He appears to adopt a result-oriented approach, suggesting that *because* statutory immunity has precluded claims in cases involving more serious injuries (or death), he should likewise be protected here.

The Jenkinses see it differently. They identify numerous disputed factual issues about how Brandi approached Deputy Brooks and the surrounding environment, and they argue that the facts were sufficient for a jury to find him grossly negligent for opting to pull the trigger rather than adopting a less extreme course of action. As they see it, the

evidence supported their version of events—from the testimony of the officers to the videotape of the confrontation—and justified submitting the case to the jury.

The MTCA did away with the principle of sovereign immunity in certain circumstances, *Tollenger v. State*, 199 Md. App. 586, 595 (2011), such that the State assumes liability for "intentional torts and constitutional torts as long as they were committed within the scope of state employment and without malice or gross negligence." *Lee v. Cline*, 384 Md. 245, 256 (2004). If the employee is found, however, to have acted *with* malice or gross negligence, even though in the course of his employment, the State does not assume liability for his conduct.

It might seem that gross negligence, the less egregious of the two standards, would be easier to describe, but over time courts have struggled to articulate a consistent definition. The best overarching statement of the principle comes from *Barbre v. Pope*, 402 Md. 157, 187 (2007), in which the Court of Appeals adopted language from a *non-MTCA* setting to define gross negligence in the context of the MTCA:

> [G]ross negligence is "an intentional failure to perform a manifest duty *in reckless disregard of the consequences* as affecting the life or property of another, and also implies a *thoughtless disregard of the consequences without the exertion of any effort to avoid them*. Stated conversely, a wrongdoer is *guilty of gross negligence* or acts wantonly and willfully *only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist*."

*Id.* at 187 (emphasis added) (quoting *Liscombe v. Potomac Edison Co.*, 303 Md. 619, 635 (1985)). The challenge, though, lies in translating this principle to different factual

14

settings—and, for our purposes, in establishing a benchmark against which we can review the trial court's decision to send the question to the jury in the first place. We start by looking to the universe of cases that have found no gross negligence as a matter of law, and then compare them with those where a jury properly considered the question.

*Boyer* sits squarely in the "no-gross-negligence" camp. There, the Court of Appeals held that the plaintiff failed to allege facts supporting gross negligence in the context of the MTCA where the defendant, a state trooper, pursued a suspect at a high rate of speed through a congested area, and the suspect—whom the trooper believed to be intoxicated at the time—crashed into the back of another vehicle and killed two passengers. *Id.* at 578-79; *see also Khawaja v. Mayor & City Council, City of Rockville*, 89 Md. App. 314, 318-20 (1991) (holding that police sergeant's conduct "in deliberately not sounding the siren, while intentionally speeding through a red light with the [plaintiff's] automobile in view," did not constitute gross negligence for purposes of immunity under local government tort claims act, because the plaintiff had to demonstrate a "reckless disregard for human life," and not just reckless driving); *Tatum v. Gigliotti*, 80 Md. App. 559, 569 (1989) (holding in context of Good Samaritan statute that emergency medical technician's failure to properly treat asthma patient did not constitute gross negligence, where even plaintiff's expert did not testify that defendant's actions constituted "reckless disregard for human life").

In the opposite camp are cases involving not just gross negligence, but also malicious conduct. *Barbre* is a good example: the Court of Appeals held that the plaintiff sufficiently alleged malice and gross negligence where the officer allegedly ordered him

15

to raise his hands and, despite his compliance and being unarmed, "approached with his gun drawn and shot him in the neck." 402 Md. at 190. So too *Sawyer v. Humphries*, 322 Md. 247, 261 (1991), in which the plaintiff alleged that the officer, "unprovoked and without cause," threw rocks at his car, wrestled him to the ground, hit him and threatened to kill him. In both instances, the officers' conduct really could not reasonably be viewed simply as "reckless" (*i.e.*, merely grossly negligent, as opposed to malicious), because it included an element so intentional—shooting, throwing, wrestling, threatening—as to leave little doubt about malice.

Gross negligence *without* malice lies somewhere in between. As the Court explained in *Barbre*, gross negligence is "'more akin to reckless conduct,'" 402 Md. at 187 (quoting *Taylor v. Harford Cnty. Dep't of Soc. Servs.*, 384 Md. 213, 229 (2004)), but in the absence of malice, gross negligence is often "more troublesome" to define because of the "fine line . . . between allegations of negligence and gross negligence," *id.* at 187, incorporating a subtle element almost of intentional indifference. But it is not good enough simply to parrot the word "gross": a plaintiff "must point to specific evidence that raises an inference that the defendant's actions were improperly motivated." *Chinwuba v. Larsen*, 142 Md. App. 327, 382 (2002) (internal citations omitted), *rev'd in part on other grounds*, 377 Md. 92 (2003); *Boyer*, 323 Md. at 579-80 (requiring that the plaintiff plead facts to show a "wanton and reckless disregard for others" on the part of the defendant).

We recently reversed a trial court's decision to enter judgment in favor of a police officer who pursued a suspect onto an exit ramp, and made contact with his motorcycle,

16

which threw the suspect off the cycle and killed him. *See Holloway-Johnson v. Beall*, ---Md. App. ---, Sept. Term 2012, No. 2338 (filed November 25, 2014), slip op. at 5, 24. And we reaffirmed in that case that the gross negligence inquiry is inherently fact-bound: "because of the 'troublesome' factual problem of trying to differentiate between simple and gross negligence, the issue is usually one for the jury, not the court." *Id.*, slip op. at 23.

Viewed against this backdrop, the trial court in this case properly denied the motion for judgment so long as the Jenkinses introduced evidence sufficient to permit the jury to infer that Deputy Brooks acted either with the intent to inflict injury or with "utter indifference" to the rights of others, and we have no trouble finding that standard met here. The jury had in front of it testimony and videotaped evidence from which it readily could infer that he acted indifferently to the Jenkinses' rights in concluding that Brandi posed a threat and that he acted intentionally when he fired his gun at her as he did:

- Not only was there no evidence that Brandy was vicious or threatening, but counsel for Deputy Brooks conceded in opening statement that "there's not going to be any evidence [in] this case that . . . Brandi was a vicious animal in any way. The evidence is going to be that Deputy Brooks didn't know;"

- The videotape showed Brandi wagging her tail as she approached the Deputy, and that she did not approach him at an inordinate speed or in a crouched position; and

- Rather than using some lesser form of force or deterrent, the videotape showed Deputy Brooks aiming his gun directly at Brandi's chest, and his bullet created a "small wound . . . behind her shoulder, and a large . . . gaping wound . . . in front of her leg, . . . in her chest area . . . where the tissues were . . . destroyed."

The jury was not, of course, required to find gross negligence from these facts. But the evidence sufficed to support the jury's finding that the Deputy overreacted to the

17

potential threat, responded with excessive force, and acted with reckless indifference, and the court was correct to allow the jury to make that decision.

Deputy Brooks cites cases in which courts did find the pleading or evidentiary threshold not met, but none of them compels a reversal here. For example, he claims that the facts in *Khawaja*, in which we held that the driver's deliberate decision not to sound a siren while speeding through a red light did not amount to gross negligence, were "far more egregious than what occurred here." But importantly, the trial court there *dismissed the complaint* because gross negligence was not pled with specificity, 89 Md. App. at 318, a failure the Deputy has not alleged here. *Wells v. State*, 100 Md. App. 693 (1994), does not help either—there, the complaint alleged negligent supervision on the part of Department of Social Services supervisors for failing to prevent the beating death of a child at another's hands:

> These allegations, taken in a light most favorable to appellants, suggest *individual negligence and bureaucratic mismanagement and incompetence*; they suggest a critically important governmental unit not properly doing its job because of underfunding, understaffing, lack of effective leadership and supervision, lack of training, and lack of clear procedures and protocols. *They do not indicate*, however, malice, evil intention, or wanton, *willful, or reckless disregard for human life or the rights of others*. In short, they do not allege gross negligence on the part of any of the defendants.

*Id.* at 705-06 (emphasis added). The same holds for *Tatum*, where the plaintiff failed to show that the paramedic acted with disregard of the decedent's condition as they travelled to the hospital (and indeed the paramedic's own uncontradicted testimony showed that he

attempted on numerous occasions during the ambulance ride to assist the decedent with medical care). 80 Md. App. at 569. The evidence here—and perhaps most prominently, the video evidence—created genuine issues of disputed material fact for the jury to resolve on the critical element of Deputy Brooks's mental state as he made the decision to use deadly force on the family dog.

More recently, in *Newell*, the Court of Appeals explained that it is "*for the trier of fact*" to determine whether a defendant acted with gross negligence or malice that removes him from the protections of the MTCA. 407 Md. at 636 (emphasis added). Although there the decision affected not the physical well-being but the employment status of the plaintiffs, the court found that a trier of fact could infer that the defendant terminated the plaintiffs' employment with "a conscious disregard for their rights as employees." *Id.* at 639. Although the Court conceded that the defendant's decision may have been grounded in a "legal mistake," it was for a trier of fact to adopt that position *or* the plaintiffs'. *Id.*; *see also Holloway-Johnson*, slip op. at 24 ("Demarcating the illusive line between simple negligence and gross negligence is frequently far more a matter of persuasion, as a matter of fact, than of production, as a matter of law.") The same was true here: it is not up to us, but rather to a jury to determine which version of events they believe. The plaintiffs here presented sufficient evidence on which a jury could conclude that Deputy Brooks acted with a conscious disregard of the Jenkinses' rights when he fired his gun at Brandi, and the court did not err in submitting the issue to the jury to decide.

**B.      The Trial Court Properly Capped Only The Damages For Brandi's Treatment.**

Deputy Brooks next argues that the trial court should have capped *all* recoverable damages from the dog shooting by applying CJ § 11-110, not just the economic award (which it did reduce from $20,000—$10,000 each to Mr. Jenkins and Mrs. Jenkins—to a total of $7,500), but also the *non-economic* mental anguish damages awards of $200,000 to the couple ($100,000 to each).[10] We address the statute first and the mental anguish damages second, but really the issues are two sides of the same coin.  The nature of the Jenkinses' claim served *first* to remove all but the vet bills from the statute's reach, and *then* to expose the Deputies to the Jenkinses' actual damages.

### 1.      CJ § 11-110 and the limitation on damages

Section 11-110 caps compensatory damages for the death or injury of a pet to a total of $7,500 in lost economic (not emotional) value and veterinary bills:

> (a)(1) In this section the following words have the meanings indicated.
>
> (2) "Compensatory damages" means:
>
> (i) In the case of the death of a pet, the fair market value of the pet before death and the reasonable and necessary cost of veterinary care; and
>
> (ii) In the case of an injury to a pet, the reasonable and necessary cost of veterinary care.

---

[10] Deputy Brooks argues specifically that the entire award of $220,000 should be reduced to $7,500 total as constituting "all damages arising from the shooting [of] the dog."

20

(3)(i) "Pet" means a domesticated animal.
(ii) "Pet" does not include livestock.

(b)(1) A person who tortiously causes an injury to or death of a pet while acting individually or through an animal under the person's direction or control is liable to the owner of the pet for compensatory damages.

(2) The damages awarded under paragraph (1) of this subsection may not exceed $7,500.

*Id*.

The question here, and one not previously addressed in a reported appellate decision, is how far this cap reaches. According to Deputy Brooks, the plain meaning of the statute limits all "compensatory damages arising from tortious injury," and thus limits the Jenkinses only to the capped compensatory damages even in the context of these constitutional tort claims. Notwithstanding Maryland Rule 1-104, he cites two unreported decisions from this Court, *Ferrell v. Benson*, No. 1740, Sept. Term 1997 (Md. App. April 16, 1999), and *Hurd v. Haberkorn*, No. 980, Sept. Term 2010 (Md. App. January 24, 2012), distinguishing *Hurd* and arguing that *Ferrell* properly read the statute's use of the phrase "tortious injury" to "include actions for both intentional and non-intentional torts." He also cites a reported case from the United States District Court for the District of Maryland, *Stanley v. Central Garden & Pet Corp.*, 891 F. Supp. 2d 757 (D. Md. 2012), that held that CJ § 11-110 limited a pet owner's recovery for damages to her dog when he was injured after chewing on a product Stanley had manufactured. *Id.* at 768. The MVMA *amici* offer support by pointing us to numerous other states' laws that, in their view, demonstrate a

21

nationwide trend to limit damages for injuries to pets. They also argue that "mainstream American jurisprudence" compels us to reject what they call "emotion-based damages" in cases involving injury to pets.

In response, the Jenkinses argue that the trial court correctly applied CJ § 11-110 to reduce that part of the award ($20,000) that the jury determined would address the economic losses they incurred in treating Brandi's injuries. They also claim that as a matter of statutory interpretation, CJ § 11-110 does not cap "damages ordinarily available under the law that are not expressly mentioned or included in the statute." They argue at length that the (unreported) *Hurd* case correctly read the statute to apply only to compensatory damages.[11] The ALDF, which sides with the Jenkinses, offers what it calls "the broader social and legal context supporting an award of non-economic damages in this case" and argues that we should recognize a plaintiff's right to recover noneconomic damages in any case where tortious injury has befallen an animal companion. The MALC offers a similar perspective.

---

[11] The Jenkinses argue as well that Deputy Brooks waived this argument when his counsel stated at trial that he was not relying on CJ § 11-110 to limit damages, but we can dispense with this argument quickly. Although counsel for Deputy Brooks did say in the cited passage that he was not relying on the statute with respect to a particular *jury instruction*, that comment was not an overt concession that the cap did not limit any damages in the case—particularly in light of the fact that the issue had been fully briefed prior to trial.

22

We review *de novo* the trial court's decision on this question of statutory interpretation.[12] *Reier v. State Dep't. of Assessments & Taxation*, 397 Md. 2, 26 (2007); *Sail Zambezi, Ltd. v. Maryland State Highway Admin.*, 217 Md. App. 138, 150 (2014). Our "'primary goal is always to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision.'" *Miller v. Mathias*, 428 Md. 419, 450 (2012) (quoting *Ray v. State*, 410 Md. 384, 404 (2009) (internal citations omitted)). The logical starting point, of course, is the "normal, plain meaning of the language of the statute, reading the statute [or rule] as a whole to ensure that 'no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'" *Id.* at 450–51 (quoting *Ray*, 410 Md. at 404 (internal citations omitted)). If the statutory language is "clear and unambiguous," we look no further. *In re Sean M.*, 430 Md. 695, 703 (2013). On the other hand, when the language of a statute presents an ambiguity and is subject to more than one interpretation, we dig deeper. *Lipitz v. Hurwitz*, 435 Md. 273, 283-84 (2013). We consider "the purpose and objective of the legislature's enactment," and must be careful to "avoid statutory constructions that are 'illogical, unreasonable, or inconsistent with common

---

[12] Although the court in *Hurd* made reference to CJ § 11-110 and its legislative history, we do not address that opinion or the unreported opinion in *Ferrell*, despite the parties' discussion of them, because of the specific prohibition in Maryland Rule 1-104. Whatever reliance either party places on those opinions, and whatever resemblance our analysis bears to theirs, neither played a role in our analysis. *See Nicholson v. Yamaha Motor Co., Ltd.*, 80 Md. App. 695, 717 n.5 (1989)).

23

sense.'" *Coroneos v. Montgomery Cnty.*, 161 Md. App. 411, 424 (2005) (quoting *Bd. of Physician Quality Assur. v. Mullan*, 381 Md. 157, 168 (2004)).

We see no ambiguity about the purpose of this statute: by its very terms, it defines and limits the compensatory damages value of pets—which the law always have treated as chattel (not cattle, *see* § CJ 11-110(a)(3)(ii))—"[i]n the case of the death of a pet" or "[i]n the case of an injury to a pet." CJ § 11-110(a)2)(i) and (ii). Whether or not we might agree with the decision to value pets for these purposes entirely in terms of market value or vet bills, or with the dollar figure the General Assembly chose, the alternative is complicated, unpredictable, and potentially awkward. The common law normally doesn't distinguish one form of physical property from another—if a tortfeasor damages another's personal property, the victim recovers its economic value. It is not at all uncommon for there to be a gap between a good's economic value and its value to its owner—a low-value piece of artwork or china, for example, might be priceless in sentimental terms because it came from a favorite relative—but the ultimate (and recoverable) economic value of these and most other forms of property can be measured objectively, and juries can resolve any factual disputes as to the final value figure. But how does one value a pet? Is a mixed-breed or rescue dog worth less than one with a champion pedigree? Is an older dog worth less than a younger one? Is a dog worth more because it comes from a family with young children, who now have lost their pet? Should juries be in the business of determining whether a dog was a "good dog" or a "bad dog," whether a dog was well-trained or did

24

tricks, projecting a dog's life expectancy, and putting dollar values on the difference? The General Assembly decided they shouldn't be.

Although we don't need it for interpretive purposes, the legislative history of CJ § 11-110 bolsters this point. When the General Assembly first passed it in 1989, *see* 1989 Md. Laws ch. 594, its stated purposes were to "establis[h] a certain method for the measurement of damages for an injured pet," "and defin[e] a term." The legislation was introduced to "correct" what some viewed as an anomalous result in a civil case, *Davis v. Gary*, that involved a plaintiff whose family pet, a mixed-breed dog valued at no more than $250, suffered injuries after being attacked by the defendant's Bloodhound. The plaintiff sought to recover veterinary expenses that totaled nearly $2,000, and even though the plaintiff prevailed in district court, the court awarded her only $250. The circuit court affirmed and increased the award to $600.[13] (The Court of Appeals denied the plaintiff's subsequent petition for *certiorari*.) The statute has been amended twice since, to increase the damages cap and to provide some additional specificity. In 1999, a new section clarified that "pet" did not include livestock, and recoverable damages increased from $2,500 to $5,000. 1999 Md. Laws, Chap. 399. And in 2005, the statute added the term

---

[13] Most likely, the trial court awarded $250 as the fair market value of the dog, *see, e.g., Bastion v. Laffin*, 54 Md. App. 703, 714 (1983) (defining "[t]he measure of damages for tortious injuries to personal property" as "the lesser of the difference between the value of the property immediately before the harm has been done and its value immediately thereafter or the reasonable cost of repairs"), and it may be that the circuit court simply viewed that calculation differently.

25

"compensatory damages," defined it, altered the language of CJ § 11-110(b) to impose liability affirmatively for compensatory damages on one who "tortiously causes" the injury to a pet, and changed the damages limitation to $7,500. 2005 Md. Laws, Chap. 250.[14]

All this means, though, is that the General Assembly limited the extent of a tortfeasor's liability for the tortious injury he causes to a pet. This statute does not, and cannot, alter the fundamental nature of the underlying (in this case, constitutional) tort. Nor does it limit a victim's *overall* recovery for a tort that includes, but isn't limited to, damage to a pet for vet bills up to $7,500. A far-fetched example illustrates the point. Suppose that someone distractedly (and thus negligently) drove his car into the wrong driveway, crashed into his next door neighbor's garage, smashed the garage door and the car just inside it, and injured the neighbor's rabbit, who lived in a hutch along the garage wall. The Deputy's theory of CJ § 11-110 would limit the neighbor's recovery to the bunny's vet bill and preclude any recovery for the much greater damage to the neighbor's car or house. That cannot be the result the General Assembly intended for that hypothetical or for this case.

---

[14] Although the bill file from 2005 contains some reference in background information to certain out-of-state cases that permit recovery of non-economic damages for injury or death of a pet, the purposes of the bill do not make reference to recovery of such damages. A letter from the Attorney General's Office discussing the effect of the bill characterizes the change to the law as improving it by permitting an owner to recover "both the fair market value of the pet before death and the reasonable and necessary cost of veterinary care."

The argument becomes even more untenable when we bring it back to this case. On the count at issue, the Jenkinses alleged that Deputy Brooks violated their rights under Articles 24 and 26 of the Maryland Constitution when, acting with gross negligence, he used excessive force and shot Brandi. They alleged more than one form of damage from the Deputy's actions, and the law entitled them to recover more than just property damage. At the time CJ § 11-110 was enacted, the law of constitutional torts was only just developing,[15] and we see no suggestion (nor does Deputy Brooks point us to any) that the legislature intended to limit recovery for constitutional torts, or any others for that matter, more broadly than the pets-as-property damage limitation we see on the face of the language.[16] So the trial court was correct to reduce the Jenkinses' recovery for Brandi's

---

[15] In the context of excessive force claims against law enforcement officers, "the concept of a 'constitutional tort' first entered the American landscape in *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*," 403 U.S. 388 (1971), T. Hunter Jefferson, *Constitutional Wrongs and Common Law Principles: The Case for Recognition of State Constitutional Tort Actions Against State Governments*, 50 Vand. L. Rev. 1525, 1529 (1997), the body of law really only began to emerge in the eighties and nineties. *See id.* at 1534-35; *see also Widgeon v. Eastern Shore Hosp. Center*, 300 Md. 520 (1984) (recognizing that where "individual rights, such as those protected by Article 26, were preserved by a fundamental document . . . a violation of those rights generally could be remedied by a traditional action for damages.").

[16] Coincidentally, in the 1989 legislative session, House Bill 364 proposed to add a provision to the Maryland Tort Claims Act that "would have provided that '[i]mmunity is not waived' under the [MTCA] for 'any state . . . constitutional claim.' In the course of the bill's legislative process, this provision was amended out. Ultimately House Bill 364 did not pass." *Ritchie v. Donnelly*, 324 Md. 344, 374 n. 14 (1991). So although the concept of constitutional torts was surely out there, the history of CJ § 11-110 suggests no such awareness of their effect in that context.

*veterinary* bills from the original $20,000 award to the total of $7,500. But nothing about CJ § 11-110 vitiated their existing right to recover, on appropriate proof, whatever non-pet damages they could prove, including their non-economic damages, for the Deputy's grossly negligent violation of their constitutional rights. Put another way, if the Deputy's bullet had missed Brandi, entered the house, and hit an expensive china vase sitting on the mantle, there would be no doubt that the Jenkinses could recover the economic and non-economic damages they could prove. Because pets are property, CJ § 11-110 defines their property value, but it cannot rationally be read to cabin a grossly negligent official's total liability based on the fortuity that he shot a pet rather than something inanimate.

We express no views on CJ § 11-110's reach in other circumstances, such as whether it reasonably would be construed to cover veterinary malpractice cases, product liability cases such as *Ferrell*, or other similar situations. We hold only that it *does not* limit the Jenkinses' total recovery for the constitutional tort to the capped value of their pet's vet bills.[17]

---

[17] We note in passing that the *Stanley* case doesn't change the outcome here. Although the *Stanley* court did apply the statute, the injuries there were "tortious" in the classic sense— injuries to a dog because of the dangers allegedly posed by the defendant's product, where the plaintiff proceeded on claims in negligence, strict liability, and fraud. *Id*. at 768. The court pointed out as well that CJ § 11-110 did not limit the plaintiff's damages on her implied warranty, unjust enrichment, and Maryland Consumer Protection Act claims. *Id*. (It did hold that she could not recover non-economic damages under these claims.)

### 2.    Mental anguish damages under Counts 3 and 5.

*Next*, Deputy Brooks appeals the award of damages in the shooting incident under Count 3 (Trespass to Chattel) and Count 5 (Article 24 Violation), arguing that the trial court should not have denied his Motion for Judgment on the Jenkinses' claim for mental anguish damages relating to the shooting.  Maryland Rule 2-519 provides that "[a] party may move for judgment on any or all of the issues in any action at the close of the evidence offered by an opposing party" and that the "moving party shall state with particularity all reasons why the motion should be granted."  Md. Rule 2-519(a).  We review the circuit court's decision *de novo*.  *Thomas v. Panco Mgmt. of Md., LLC,* 423 Md. 387, 393-94 (2011).  "'[W]here the evidence is not such as to generate a jury question, *i.e.*, permits but one conclusion, the question is one of law and the motion must be granted.'" *Ayala v. Lee*, 215 Md. App. 457, 467 (2013) (quoting *Address v. Millstone*, 208 Md. App. 62, 80 (2012), *cert. denied*, 430 Md. 646 (2013)).  On the other hand, the trial court should deny a motion for judgment "if, from the evidence adduced that is most favorable to the plaintiff, a reasonable finder of fact could find the essential elements of the cause of action by a preponderance standard."  *DeMuth v. Strong*, 205 Md. App. 521, 547 (2012).

Deputy Brooks argues that the Jenkinses could not recover "for mental-anguish type damages for tortious injury to property in Maryland in the absence of fraud, malice, or *other like motives*." (Emphasis added.) Citing *Exxon Mobil Corp. v. Albright*, 433 Md. 303 (2013), he claims that the facts here do not constitute any "extenuating circumstances" that could fall under the "other like motives" umbrella.  The Jenkinses counter with two

arguments: *first*, that the gross negligence that the jury found qualifies as an "other like motiv[e]," and *second*, that this limitation on emotional damages doesn't apply in any event because they sought recovery not simply for *witnessing* the injury to Brandi, but for the harm done *directly* to them based on the violation of Article 24.

*First*, we disagree with the Jenkinses that the "other like motives" analysis under *Exxon* and earlier cases applies here (although we will discuss it below when we address the trespass claims). Cases using this framework involved claims relating to *real property*, *see, e.g.*, *Dobbins v. Wash. Suburb. Sanitary Comm'n*, 338 Md. 341 (1995); *Wolf v. Levitt & Sons, Inc.*, 267 Md. 623 (1973), and we are not aware of any cases that apply the rule to a claim involving trespass to *chattel* (*i.e.*, trespass to *personal property*). And it is not obvious that it should apply—a trespass to chattel is more like conversion than a trespass to real property. *See, e.g.*, *Darcars Motors of Silver Spring, Inc. v. Borzym*, 150 Md. App. 18, 41 (2003) (remarking upon the "difference in degree between a more serious conversion of property and a less serious trespass to property"), *aff'd*, 379 Md. 249 (2004).

*Second*, however, the Jenkinses *were* entitled to recover non-economic damages in connection with their constitutional claim. Beyond the trespass to chattel claim, the jury also found that Deputy Brooks acted with gross negligence in violating the Jenkinses' *constitutional rights*. *See Widgeon v. Eastern Shore Hosp. Ctr.*, 300 Md. 520, 537-38 (1984) (holding that "where an individual is deprived of his liberty or property interests in violation of Articles 24 and 26, he may enforce those rights by bringing a common law action for damages"); *see also Prince George's Cnty. v. Longtin*, 419 Md. 450, 482-90

30

(2011) (affirming a $6.2 million verdict in favor of an arrestee whom police had held for eight months in spite of possessing exculpatory DNA evidence); *Espina v. Prince George's County*, 215 Md. App. 611, 657 (2013), *cert. granted*, 438 Md. 132 (May 15, 2014) (holding that plaintiff could recover for an Article 24 claim even though the jury had found that a police officer was not guilty of assaulting the victim).  It may be that the jury awarded more damages because Brandi is a beloved family dog rather than an inanimate object, but that doesn't define the nature of the claim.  *Cf. Brown v. Muhlenberg Twp.*, 269 F.3d 205, 218 (3d Cir. 2001) (concluding that Pennsylvania law would allow recovery for intentional infliction of emotional distress where police officer fired five rounds into owner's dog, reasoning that "in such cases, the malicious behavior is directed to the owner as well as to the pet, with the potential for serious emotional injury to the owner being readily apparent").  The jury had the opportunity to view Deputy Brooks, and Brandi coming toward him, for what even the Deputy concedes was a full eight seconds, and found affirmatively that Deputy Brooks acted with gross negligence.  That finding entitled the Jenkinses to seek and prove noneconomic damages.

## C.     The Trial Court Did Not Err In Declining To Reduce The Verdict On The Shooting-Related Claims.

The Deputies contend that the damages the jury awarded for the shooting were grossly disproportionate to the amount of medical care the dog received (they contend that there was a "more than 30 to 1 ratio" between the $200,000 award and the $6,100 veterinary

31

care bills).[18] The Jenkinses respond that the jury arrived at a reasonable award in light of all the evidence and that the Deputies cannot justify a reduction. We review a trial court's decision to reduce a jury verdict (or not) for an abuse of discretion. *Owens-Illinois, Inc. v. Hunter*, 162 Md. App. 385, 415 (2005). Maryland Rule 2-533 gives the trial court broad discretion, and "it is for the trial judge to determine whether a verdict "shocked his conscience," was "grossly excessive," or merely "excessive." And the Jenkinses are correct that the bar is a high one:

> [A]ll of these formulae mean substantially the same thing, . . . that the damages are "such as all mankind must be ready to exclaim against, at first blush," being used to indicate the trial judge should extend the fullest consideration possible to the amount returned by the jury before it concludes that it shocks his conscience, is "grossly excessive" or is "excessive."

*Conklin v. Schillinger,* 255 Md. 50, 69 (1969) (citations omitted).

---

[18] We assume that the Deputies have borrowed from *Owens-Illinois v. Hunter*, 162 Md. App. 385, 415 (2005), in which we noted that "one of the factors judges may consider in evaluating remittitur motions is the proportional relationship between noneconomic personal injury damages awarded and the compensatory damages deriving from the same injury." *Id.* (citing *Conklin v. Schillinger*, 255 Md. 50, 70 (1969)).

Even so, the Deputies' ratio argument does not withstand closer mathematical scrutiny. The jury awarded each plaintiff $100,000 in non-economic damages and $10,000 in economic damages, so the ratio from the jury's perspective was only ten to one. The Deputies only get to their ratio figure by weighing the *combined* non-economic damages awarded to both plaintiffs against the single post-*remittitur* economic damages amount, which seems artificially skewed.

Against that standard, we disagree with the Deputies that the $200,000 verdict was excessive.[19] The Jenkinses presented not just testimony, but also videotape evidence of what took place:

- The videotape shows Mr. Jenkins visibly upset, and Mrs. Jenkins holding Brandi and crying.

- Mr. Jenkins testified that he feared Brandi was going to die, and her cry on the way to the vet "was something I never heard in my life, and . . . my wife's still hysteric[al], . . . I was hopin' that that dog wouldn't pass away in my wife's arms."

- Brandi had bandages on her shoulder that had to be changed every three to four hours for about ten days. (Mrs. Jenkins could not change the bandages because, as Mr. Jenkins implied, it was too upsetting for her.) She required constant attention during her recovery to keep her calm and keep her staples and drainage tube from coming out.

- Mr. Jenkins testified that the family's "lifestyle was changed. We . . . pretty much stayed home all the time to try and make sure . . . [Brandi] was getting attention that she needed."

- Brandi continues to be "very nervous and anxious," keeping the Jenkinses up at night even at the time of trial.

- Mr. Jenkins testified that now when people come to his door, he and his wife become "jittery and nervous," and as he put it, "we kind of feel that we're little prisoners in our own little area here now."

- Mrs. Jenkins testified to the fear she felt at the time of the shooting, both because she was "terrified" that Deputy Brooks was going to shoot her husband and because she was afraid her husband was going to die.

---

[19] Although this argument went to the entire verdict, we address it only as it relates to the shooting because, as we discuss next, we are reversing the judgment on the trespass to property claim.

33

- Mrs. Jenkins also testified to the difficult ride to the vet, and the fact that she thought of Brandi as "part of [the] family." She testified to the disruption of the family's routine during Brandi's recovery because of the logistics of having to change her dressing and how upset she was at seeing Brandi's condition.

- After the shooting, Mrs. Jenkins began to have panic attacks, which she'd had before but subsided. She testified that she would move if she could, because she relives the incident daily when she pulls into the driveway. As she put it, she no longer feels at home.

The jury concluded from the evidence that Deputy Brooks had acted with gross negligence and awarded damages accordingly. The trial judge explained after lengthy post-trial argument that she knew of no case with similar circumstances that would have justified reducing this verdict, and the Deputies have not identified one (nor has our research unearthed any). We agree with the court that it was for the jury to make the determination, that it had ample evidence of the damage that the Jenkinses suffered, and that permitting *remittitur* "would just open up every jury verdict to . . . saying [that it was . . . ] just not warranted by the evidence." The court properly exercised its discretion in declining, under the circumstances, to substitute its judgment for the jury's.[20]

---

[20] We also find that the trial court also did not improperly conflate the constitutional claims. The Deputies argue that the court allowed the jury to consider a claim under Articles 24 and 26 for the shooting, when it should only have permitted it under Article 26. We agree that an Article 26 claim could properly have been brought, but Article 24 permits a claim for excessive force too. *See Espina*, 215 Md. at 654 (citing *Graham v. Connor*, 490 U.S. 386 (1989)).

**D.** **The Deputies Were Immune To Suit For Constitutional Trespass And The Jenkinses Were Not Entitled To Mental Anguish Damages For Common Law Trespass.**

*Finally*, Deputies Brooks and Rector appeal the award of damages for common-law and constitutional trespass. To recap, the jury found gross negligence on the part of both Deputies under the *common-law trespass claim* (Deputy Brooks: Questions 7-9 (Count 2); Deputy Rector: Questions 21-23 (Count 2)), and liability but *no* gross negligence or malice under the *constitutional claim* (Deputy Brooks: Questions 4-6 (Counts 6 and 7); Deputy Rector: Questions 18-20 (Counts 6 and 7)). The Deputies argue *first* that because the jury found no malice or gross negligence in the context of the constitutional trespass claim, they were immune from liability on those claims; and *second*, the Jenkinses were not entitled to recover mental anguish, pain, and suffering damages in connection with the remaining trespass claim, which arose at common law. The Jenkinses respond that because the Deputies argued for a verdict sheet that allowed the jury to award damages for the trespass claims in the aggregate, and not by count, they cannot now challenge the generality of the resulting verdict. They also argue that the Deputies failed to preserve any argument regarding lack of damages for appellate review.

**1.** **The Deputies are not liable personally for constitutional trespass.**

We agree with the Deputies that once the jury found that they acted without malice or gross negligence, the MTCA immunized them from personal liability on the Jenkinses' constitutional claim for entry into the home. *Ford v. Baltimore City Sheriff's Office*, 149

35

Md. App. 107, 120 (2002). A State employee "acting within his or her scope of employment and without malice or gross negligence is immune from suit," *id*. (citing CJ § 5-522), and the jury resolved that threshold mental state question (which we agree the court properly submitted to the jury, although it was a close call in light of the indisputably valid arrest warrant that brought the Deputies to the house in the first place) in the Deputies' favor.

### 2. The Jenkinses are not entitled to mental anguish or pain and suffering damages for common-law trespass.

This leaves the common-law trespass claim. On this claim (and unlike the constitutional trespass claim), the jury found that the Deputies acted with gross negligence. That seems, at least at first blush, to create a potential inconsistency between the verdicts on the constitutional and common-law trespass claims, an argument that the Deputies raise in their briefs. But we need not resolve that possible discrepancy because the Jenkinses' claim fails at the damages phase of the analysis.

In *Exxon Mobil Corp. v. Albright*, the Court of Appeals reiterated that a plaintiff must establish "malice, fraud, or other like motives" to recover damages for emotional distress "attendant to property damage." 433 Md. at 395. The Jenkinses argue that the jury's gross negligence finding on the common-law trespass claim qualifies as an "other like motive" for these purposes. This matters because the jury was asked only to consider "Non-Economic Damages (mental anguish, pain and suffering)" in connection with the trespass claims, and the $100,000 the jury awarded to each plaintiff against each Deputy

36

(a total of $400,000) fell entirely into that category. And since the jury declined to find malice with regard to the trespass, the Jenkinses' common law damages claim fails altogether unless this "other like motives" concept applies and covers the Deputies' actions.

The Court of Appeals in *Exxon* cited *Ford* for the "other like motives" language, but it originated in the Court's decision in *Zeigler v. F Street Corp.*, 248 Md. 223 (1967).[21] A close look at that case suggests that although *Zeigler* intended to leave a door open for some undefined category of damages premised on a trespass, it left it open a crack too small for the Jenkinses' claims here. The plaintiff in *Zeigler* owned property with her husband that sustained considerable damage after the defendant began developing adjacent property. The problems with the property continued unabated for many months, and Mrs. Zeigler claimed that they led her husband to develop a nervous condition and ultimately caused his death. *Id.* at 225. Her complaint initially alleged a willful trespass, but after a hearing she ended up claiming only negligence on the part of the defendant. *Id.* at 225. The trial court decided that she could not recover damages on behalf of her husband's estate because his death "was not a foreseeable consequence of the negligent acts of the defendants causing damage to the plaintiff's property." *Id.* at 226.

---

[21] We note preliminarily that *Zeigler* and its progeny have applied historically to cases where the plaintiff claims damages for emotional distress where an *underlying* claim asserts damage to the real property that is the subject of the trespass. Although the Deputies do not raise it here, we see as a preliminary hurdle one that the Jenkinses have not overcome: they never established any damage to their property or their home in the first place. Mr. Jenkins testified that the house was in the state they left it when they returned from the veterinarian's office.

The Court of Appeals affirmed, although it allowed for the *possibility* that a plaintiff could recover for mental suffering and emotional distress flowing from damage to property without a predicate physical injury. The Court qualified that possibility, though, by noting that "*ordinarily*, there can be no recovery for mental suffering, resulting from damage done to property." *Id.* at 226 (emphasis added) (citations omitted). Quoting the then-current version of *Corpus Juris Secondum* on Damages, the Court limited mental anguish damages for injury to property, but carved out certain cases using the language that the Court quoted later in *Exxon*:

> [U]nder ordinary circumstances there can be no recovery for mental anguish suffered by plaintiff in connection with an injury to his property. Where, however, *the act occasioning the injury to the property is inspired by fraud, malice, or like motives*, mental suffering is a proper element of damage. It has been held that an injury to property alone will not support a recovery for fright occasioned by such injury.

*Id.* (emphasis added). The Court included in that catch-all category certain factual circumstances that might justify recovery, "such as intentional conduct on the part of the defendant that could foreseeably result in injury to the plaintiff, or conduct by the defendant that endangered human safety." *Id.*

The Court of Appeals extended this limitation to a trespass action in *Wolf v. Levitt & Sons, Inc.*, 267 Md. 623 (1973), where the plaintiffs contended that employees of the defendant trespassed onto their property in an effort to obtain information for a lawsuit between them. Mrs. Wolf claimed she became so upset upon seeing three men standing at her doors (she understood them to be Mr. Levitt's employees) that she "'fell completely

apart,'" and her husband discovered her that evening "'in such a state of extreme fright that it bordered on hysteria.'" *Id.* at 626. The Wolfs filed suit seeking damages of $150,000, including punitive damages, medical expenses, and loss of companionship by Mr. Wolf. *Id.* at 624. The Court of Appeals held that the Wolfs had presented no evidence that could bring their trespass claim within the language of *Zeigler*, and explained that the jury had properly found a "technical trespass" that entitled the Wolfs to nominal damages only. *Id.* at 630-31.

No cases we have found, however, offer any deeper insight on what range of motives might qualify as being "like" fraud or malice. Because there is no allegation here that either Deputy made any "knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment," *Black's Law Dictionary* 775 (10th ed. 2013), this turns on whether gross negligence is "like" malice, which for purposes of the LGTCA means "an intentional act done knowingly of an improper purpose without legal justification or excuse." *Thomas v. City of Annapolis*, 113 Md. App. 440, 458 (1997). In the context of punitive damages, malice is "conduct of the defendant characterized by evil motive, intent to injure, ill will, or fraud." *Owens-Illinois, Inc. v. Zenobia*, 325 Md. 420, 460 (1992). The Court of Appeals clarified there that "negligence alone, no matter how gross, wanton, or outrageous, will not satisfy this standard." *Id.* at 463. And more generally, plaintiffs have not been permitted to recover for emotional injuries flowing from negligence-level torts. *See Dobbins v. Washington Sub. Sanitary Comm'n*, 338 Md. 341, 345 (1995) ("[A] plaintiff ordinarily *cannot recover* for emotional injury caused by

39

witnessing or learning of *negligently inflicted injury* to the plaintiff's property" (emphasis added).); *H&R Block, Inc. v. Testerman*, 275 Md. 46, 48-49 ("Maryland decisions have generally denied compensation for mental anguish resulting from damage to property.").

Our opinion in *Abbott v. Forest Hill State Bank*, 60 Md. App. 447 (1984), also suggests that the plaintiff must show some element of *foreseeability*. There, we held that the plaintiff had to allege "either notice of . . . mental distress on the part of the defendant *or* that the act was calculated to cause mental distress." *Id.* at 455-56 (citing *Zeigler*, 248 Md. at 226). In *Abbott*, we considered whether a plaintiff could recover damages for conversion after a bank wrongfully repossessed his car, and we held that emotional distress damages weren't recoverable for loss in property value (resulting from property damage) because the court had already dismissed an underlying fraud claim. *Id.* at 456-58.

These cases all crystallize into one straightforward principle: a plaintiff must show an *intent*, *i.e.*, an intent to deceive or an intent to harm, rather than negligence or something "'more akin to reckless conduct.'" *Barbre*, 402 Md. at 187. And although the jury found gross negligence in this case, that finding differs in degree from a finding of negligence, not in kind. It is impossible to know what might have driven the jury to distinguish the constitutional trespass claim from the common-law trespass in this regard. But we do know, and there is no dispute, that the Deputies were serving a valid arrest warrant, which gave them a proper motive to enter the home. There was no evidence adduced at trial that the Deputies were motivated by any intent to harm the Jenkinses when they entered the home—to the contrary, the undisputed evidence demonstrated that the Deputies entered

40

and left without causing any damage to the property. Because there was neither intent nor damage to support the award of $400,000 against the Deputies on the common-law trespass claim, we reverse that award.

This decision does not, however, undermine the jury's threshold decision that the Deputies committed a common-law trespass. Accordingly, and because the Jenkinses did not seek economic or actual damages for the common-law trespass, we remand with directions that the circuit court enter a judgment for nominal damages on that claim. *See Brown v. Smith*, 173 Md. App. 459, 484 & n.10 (2007) (a trespass violation entitles the plaintiff to nominal damages, whereas an injury to the property itself would entitle the plaintiff to compensatory damages).

* * *

To summarize: we affirm the trial court's reduction of the award of economic damages for the shooting of Brandi, to one $7,500 award to Mr. and Mrs. Jenkins against Deputy Brooks only; we affirm the jury's award of $100,000 in non-economic damages each to Mr. and Mrs. Jenkins, also for the shooting of Brandi, against Deputy Brooks only; and we reverse the award of $100,000 to each Mr. and Mrs. Jenkins against both Deputy Brooks and Deputy Rector—a total of $400,000—and remand for the entry of nominal damages on the trespass claim against each.

41

**JUDGMENT OF THE CIRCUIT COURT FOR FREDERICK COUNTY AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE DIVIDED EVENLY.**