*Anne Arundel County, Maryland and Rodney Price v. Michael H. Reeves*, No. 68, September Term, 2019

**CIVIL LIABILITY — STATUTORY CONSTRUCTION — MEASURE OF DAMAGES — COMPENSATORY DAMAGES —** In light of Md. Code Cts. & Jud. Proc. ("CJP") § 11-110's plain language and structure, its relationship with the Wrongful Death Act, and its legislative history, we conclude that the statute defines and caps the recovery of compensatory damages in the case of the tortious death or injury of a pet to the amount specified in the statute. Construing CJP § 11-110 to allow recovery for additional uncapped compensatory damages, including noneconomic damages, would produce illogical results.

**CIVIL LIABILITY — GROSS NEGLIGENCE — SUFFICIENCY OF EVIDENCE —** Legally sufficient evidence was presented at trial to permit a jury to make the finding that Officer Price was grossly negligent when there were specific facts in evidence at trial that the dog was not attacking the police officer, the police officer shot the dog twice while standing in front of the residence, and there were differing accounts of how the dog was positioned when shot.

Circuit Court for Anne Arundel County
Case No. C-02-CV-15-002956
Argued: September 11, 2020

IN THE COURT OF APPEALS

OF MARYLAND

No. 68

September Term, 2019

ANNE ARUNDEL COUNTY, MARYLAND
AND RODNEY PRICE

v.

MICHAEL H. REEVES

Barbera, C.J.,
McDonald
Watts
Hotten
Getty
Booth
Biran

JJ.

Opinion by Barbera, C.J.
Hotten, J., dissents.

Filed: June 7, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This case affords us the opportunity to address the scope of compensatory damages available in the case of the tortious injury or death of a pet. Resolution of that issue requires our examination of the text of Md. Code Cts. & Jud. Proc. ("CJP") § 11-110. The General Assembly enacted CJP § 11-110 to allow pet owners to recover certain capped damages for the death or injury of their pet as a result of a tort. We are asked to determine whether a pet owner may recover other forms of compensatory damages not expressly included within that statute. We must also address the separate question of whether there was sufficient evidence of gross negligence in this case.

These questions stem from Anne Arundel County Police Officer Rodney Price's fatal shooting of a family dog while carrying out his duties as a police officer. On February 1, 2014, Officer Price encountered Respondent Michael Reeves' dog, Vern, a Chesapeake Bay retriever, in the front yard of Mr. Reeves' home. Evidently believing he would be attacked, Officer Price shot Vern twice. The dog died soon thereafter. Mr. Reeves subsequently brought suit alleging, inter alia, that by fatally shooting Vern, Officer Price committed a trespass to Mr. Reeves' chattel, acted with gross negligence, and violated Mr. Reeves' rights under Articles 24 and 26 of the Maryland Declaration of Rights.

The case went to trial before a jury in the Circuit Court for Anne Arundel County. The jury returned a verdict in favor of Mr. Reeves, finding that Officer Price committed a trespass to Mr. Reeves' chattel, acted with gross negligence, and violated Mr. Reeves' constitutional rights under Articles 24 and 26 of the Maryland Declaration of Rights. The jury awarded no damages for the constitutional violations, $10,000 for the trespass to chattel claim, and $500,000 in economic damages and $750,000 in noneconomic damages

for the gross negligence claim. The circuit court then reduced the gross negligence damages to $200,000 pursuant to the Local Government Tort Claims Act ("LGTCA"). CJP § 5-301 *et seq*. The circuit court also reduced the trespass to chattel damages to $7,500 pursuant to the then-applicable damages cap in CJP § 11-110.[1]

On appeal, the Court of Special Appeals affirmed in part and held in an unreported divided decision that CJP § 11-110 did not bar Mr. Reeves from recovering noneconomic damages related to the death of his dog. The same majority also held that there was legally sufficient evidence to support the jury's verdict that Officer Price acted with gross negligence.

For reasons that follow we hold that CJP § 11-110 limits the recovery for compensatory damages to the amount specified by that statute and does not allow for recovery of noneconomic compensatory damages stemming from the tortious injury or death of a pet. In addition, we hold that there was legally sufficient evidence to support the jury's finding that Officer Price was grossly negligent in the fatal shooting of Vern. However, under the single recovery rule, we also hold that Mr. Reeves may not recover any damages under the gross negligence claim. Accordingly, we reverse in part and affirm in part the judgment of the Court of Special Appeals.

---

[1] Since the conduct underlying this case occurred, the Legislature has increased the cap to $10,000. *See* S. 143, 2017 Leg., 437th Sess. (Md. 2017). Throughout this opinion, we shall refer to the version of the statute in place at the time of the events of this case.

# I.

## Facts and Procedural History

*The Incident*

On February 1, 2014, as part of an ongoing investigation into a spate of burglaries in a residential neighborhood in Anne Arundel County, Officer Price was going door-to-door seeking relevant information. Officer Price, the only witness to the events that ensued immediately thereafter, would later testify at trial to the following. At approximately 4:45 p.m., Officer Price approached Mr. Reeves' residence from the house next door. He saw a light on inside and noticed that some of the windows were open. He also observed two doors at the front entrance to the house. One door was open; a second door, at trial variously described as a screen door and a transparent storm door, was closed. Officer Price determined from those indicators that the house was occupied at the time. He testified that he had no reason to believe that any member of the Reeves family had any involvement with the burglaries and he did not have any "cause for concern" as he approached the house.

Officer Price walked onto the front porch of Mr. Reeves' home and knocked on the closed door. When no one answered, he left the porch and headed towards Mr. Reeves' driveway, where he stood with his back to the house. As he was taking notes in his notepad, Officer Price heard the sound of a door behind him. He turned around and saw a dog "coming at" him from about five feet away. According to Officer Price, the dog was growling and barked once.

Officer Price testified that he put his left forearm up at "roughly" the level of his neck as the dog approached. Officer Price stated that the dog placed its front paws on his

3

forearm for about one second. He recalled taking one step back and pushing the dog away from him. Afraid that the dog was going to attack his face, Officer Price testified that he shot the dog twice while the dog's paws were still on his left arm. The dog then made a screeching noise and limped across the yard, where the dog collapsed. After the shooting, Officer Price informed dispatch of what happened, saying "a dog came at me." According to Officer Price, the dog did not bite or scratch him during the incident.

Officer Price is 5'8" and, at the time of the incident, weighed about 250 pounds. He testified that he had a taser, baton, and mace on his person at the time. Furthermore, he admitted that he did not vocalize any commands to the dog. At the time of the incident, Officer Price had been a sworn officer for less than a year.

Shortly after the shooting Mr. Reeves exited the house, approached Officer Price, and asked him what had happened. Officer Price recalled at trial that he responded that the dog had come at him, and he had to shoot it. Mr. Reeves testified that he then stepped forward and Officer Price responded by drawing his firearm. With his hand on the weapon, Officer Price told Mr. Reeves: "Stop. Don't take another step."[2] Mr. Reeves then turned around and rushed to where his dog Vern had collapsed on the other side of the yard and was curled up beneath the neighbor's fence. Mr. Reeves proceeded to administer CPR to Vern.

---

[2] Mr. Reeves also testified that Officer Price likewise "put[] his hand on his weapon" on two other occasions when Mr. Reeves' two sons approached Officer Price.

4

Additional officers arrived at the scene, and Officer Price returned to headquarters. Mr. Reeves testified that he believed that Vern died on the scene, but his son, Michael Reeves Jr., drove Vern to a nearby veterinary hospital where the dog was confirmed dead.[3]

*The Lawsuit and Subsequent Trial*

On September 24, 2015, Mr. Reeves and his sons, Michael Jr. and Timothy, filed a complaint asserting thirteen claims against Anne Arundel County (the "County"), Anne Arundel County Police Chief Kevin Davis, and Officer Price.[4] The claims that ultimately proceeded to trial against the County and Officer Price ("Petitioners") were: (1) trespass to chattel; (2) violation of Mr. Reeves' constitutional rights under Article 24 of the Maryland Declaration of Rights for the unlawful shooting of his dog; (3) violation of Mr. Reeves' constitutional rights under Article 26 of the Maryland Declaration of Rights for the unlawful seizure of the dog; and (4) gross negligence.

Trial in the circuit court began on May 4, 2017. Mr. Reeves' counsel called Officer Price as an adverse witness. Officer Price had previously stated in a deposition that because the dog's paws were muddy, paw prints covered his uniform. He had also stated during

---

[3] Michael Reeves Jr. testified at trial that the officers on the scene were blocking his truck for twenty to thirty minutes before he was ultimately able to drive to the veterinary hospital.

[4] Prior to trial, the circuit court dismissed the claims that Mr. Reeves' sons had brought, as well as all claims against Chief Davis. In his complaint, Mr. Reeves had also alleged civil conspiracy and a "pattern or practice" claim. Before trial, the court bifurcated those claims from the four claims that proceeded to trial. After the trial, the court resolved the bifurcated claims by granting summary judgment in favor of the County and Officer Price.

the deposition that he had dirt on both of his shoulders and on his badge. At trial, counsel for Mr. Reeves introduced photographs that the police department took shortly after the incident. When shown the photographs, one of which was magnified 300 times, Officer Price admitted that there was no mud or dirt from the dog's paws on his upper body or badge. He further acknowledged that the photographs showed mud on the thigh area of his pants. He also admitted that there were no cuts or scratches on his forearm or tears in his uniform.

Mr. Reeves' counsel then played a video deposition of the testimony of an out-of-state witness, Dr. Kevin Lahmers, a veterinary pathologist at the Virginia-Maryland College of Veterinary Medicine. Dr. Lahmers performed the necropsy on Vern's body. He could not determine which bullet was fired first. However, he testified that either bullet wound could have been fatal. According to Dr. Lahmers, one of the bullets entered through the dog's sternum area while the dog was facing the firearm, passed through the heart and lung, and lodged close to the right hip. He further testified that the other bullet entered either the right or left side of the dog's body near its ribs, "with the animal turned perpendicular to the gun," and exited the other side.

Dr. Lahmers explained that Vern weighed around 75 pounds and, based on images of the dog, if standing on hind legs Vern would only reach the stomach or mid-abdomen of an adult man of average height. Dr. Lahmer's testimony was thus at odds with Officer Price's account that Vern could have reached the height of the officer's neck while the dog's front paws were on the officer's forearm.

6

Mr. Reeves' son Timothy then took the stand and explained that his father had purchased Vern as a puppy in 2009. According to Timothy, Vern was intelligent, playful, sweet, and a quick learner. He testified that Vern had not displayed aggression towards other pets or people, including children, and Vern had no problems with large crowds in the neighborhood park. Mr. Reeves' other son, Michael Jr., testified that Vern was a member of their family.

After the testimony of his two sons, Mr. Reeves took the stand. He stated that he became interested in training dogs while stationed in Afghanistan.[5] Mr. Reeves explained that he purchased Vern for $3,000 with the goal of eventually breeding Chesapeake Bay retrievers. He took a year off from work to train the dog. Mr. Reeves taught Vern voice commands, silent commands, and water training. Mr. Reeves testified that Vern "was my best friend in the world, period."

Mr. Reeves also testified that he was taking medication to cope with the loss of Vern. He stated that he no longer had any plans to breed Chesapeake Bay retrievers. Timothy testified that his father moved from Maryland to California after Vern was killed, and that the family "had all left because that incident for my father has just destroyed him."

At the close of trial, the circuit court denied the Petitioners' motion for judgment as to Mr. Reeves' claims under Articles 24 and 26. The court submitted those claims, along with the trespass to chattel and gross negligence claims, to the jury. The circuit court

---

[5] Mr. Reeves testified that, after serving in the Marines, he had worked as a contractor in the power industry. He testified as to the wages that he earned and the fact that he had not worked since the death of Vern. Per Mr. Reeves' gross negligence claim, he alleged economic damages in the form of lost wages.

foreclosed the availability of punitive damages, though, by granting the Petitioners' motion for judgment on the issue of actual malice and punitive damages.

After deliberating for approximately one hour and thirty minutes, the jury returned the verdict finding that Petitioners had violated Mr. Reeves' constitutional rights under Articles 24 and 26 of the Maryland Declaration of Rights, Officer Price had acted with gross negligence, and he had committed a trespass to Mr. Reeves' chattel.

The jury found a violation of Mr. Reeves' due process rights under Article 24 by depriving him of his dog. However, the jury awarded him $0 in damages for that constitutional claim. The jury further found that Officer Price had violated Mr. Reeves' constitutional rights under Article 26 by "seizing" Vern and/or interfering with the use or enjoyment of the dog. The jury likewise awarded Mr. Reeves $0 in damages for that constitutional claim. As to both constitutional claims, the jury also found that Officer Price did not act with "ill will or improper motivation."[6]

The jury then found that Officer Price was grossly negligent and awarded Mr. Reeves $500,000 in economic damages and $750,000 in noneconomic damages, for a total of $1,250,000. Finally, for the trespass to chattel claim, the jury awarded Mr. Reeves

---

[6] This factual finding was relevant to the personal immunity of Officer Price under the LGTCA. Local government employees in Maryland have no immunity if they act with "actual malice," which is defined as "ill will or improper motivation." *See* LGTCA, CJP § 5-301(b) ("'Actual malice' means ill will or improper motivation."); CJP § 5-302(b)(2)(i) ("An employee shall be fully liable for all damages awarded in an action in which it is found that the employee acted with actual malice."). Because the jury found that Officer Price did not act with "ill will or improper motivation," the County is liable.

$10,000 in economic damages. The jury also made a factual finding on the verdict sheet that the dog was not attacking Officer Price at the time of the shooting.

On May 18, 2017, Petitioners filed a motion for judgment notwithstanding the verdict, remittitur, and/or a new trial. The circuit court denied the motion in full. The circuit court then reduced the jury award for trespass to chattel from $10,000 to $7,500, pursuant to CJP § 11-110. The court further reduced the total damages award for the gross negligence claim from $1,250,000 to $200,000 pursuant to the LGTCA, resulting in Mr. Reeves receiving a total of $207,500 in damages. Petitioners appealed to the Court of Special Appeals.

*The Decision of the Court of Special Appeals*

The Court of Special Appeals affirmed in part and vacated in part the judgment of the circuit court in a divided unreported opinion. *Reeves v. Davis*, No. 1191, Sept. Term 2018, 2019 WL 5606605 (Oct. 30, 2019). The majority held that CJP § 11-110 did not limit Mr. Reeves' total available damages to the capped amount stated in the statute. The majority reasoned that *Brooks v. Jenkins*, a reported Court of Special Appeals opinion also addressing the fatal shooting of a dog by a police officer, was controlling. *Reeves*, 2019 WL 5606605, at *9; *see Brooks*, 220 Md. App. 444 (2014). The majority explained that:

> The County . . . asks that we distinguish *Brooks* from this case because the jury did not award Reeves any damages for the County's constitutional violations, whereas the jury in *Brooks* did. However, . . . *Brooks* stands for the proposition that CJP § 11-110 does not bar recovery for non-economic damages, at least when the tortfeasor has been grossly negligent.

*Reeves*, 2019 WL 5606605, at *9. The majority also held that the jury was provided legally sufficient evidence to support its finding that Officer Price had acted with gross negligence.

9

*Id.* at *13.

Judge Friedman dissented, disagreeing with the majority on both issues. He interpreted CJP § 11-110 as limiting all available compensatory damages, including noneconomic damages, to the capped amount provided in the statute when the injury is to a pet. *Id.* at *14 (Friedman, J., dissenting). Given that the jury awarded no damages for the constitutional violations, under the one injury, one recovery rule, the only injury for which Mr. Reeves could recover compensatory damages was the death of his dog Vern, which is capped by the statute. *Id.* at *13–14 ("Calling Mr. Reeves' claims by different names—trespass to chattel, negligence, gross negligence, or even an intentional tort— doesn't change the analysis: there is still just one injury.") (citation omitted). Judge Friedman also would not have found that there was sufficient evidence to support a finding of gross negligence. *Id.* at *14 n.2.

On appeal to this Court, Petitioners present the following questions for review:

1) As a matter of first impression, does [CJP § 11-110] limit the amount of damages recoverable for negligently causing the death of a pet?

2) Did the Court of Special Appeals err in finding sufficient evidence of gross negligence?

We affirm the holding of the Court of Special Appeals that there was sufficient evidence to support the jury's finding of gross negligence. However, we reverse on the statutory construction issue and hold that CJP § 11-110 limits the recovery for compensatory damages to the amount specified by the statute and does not allow recovery for noneconomic damages stemming from the tortious injury or death of a pet.

10

## II.

## Discussion

*A. Statutory Construction of CJP § 11-110*

We are tasked with construing CJP § 11-110 to determine whether, as a matter of first impression before this Court, at the time of the incident the statute limited the recovery of all compensatory damages to $7,500 when a pet is tortiously injured or killed. Statutory interpretation is a question of law reviewed *de novo* by this Court. *Brown v. State*, 454 Md. 546, 550 (2017). We apply the well-established rules of statutory construction in Maryland:

> The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny.
>
> To ascertain the intent of the General Assembly, we begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.
>
> We, however, do not read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone. Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute. We presume that the Legislature intends its enactments to operate together as a consistent and harmonious body of law, and, thus, we seek to reconcile and harmonize the parts of a statute, to the extent possible consistent with the statute's object and scope.

Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose and relative rationality and legal effect of various competing constructions.

In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.

*State v. Bey*, 452 Md. 255, 265–66 (2017) (quoting *State v. Johnson*, 415 Md. 413, 421–22 (2010)).

1. Plain Meaning

We start with the text of CJP § 11-110. At the time of the incident, the statute provided in full:

(a) *Definitions*. — (1) In this section the following words have the meanings indicated.

(2) "Compensatory damages" means:
   (i) In the case of the death of a pet, the fair market value of the pet before death and the reasonable and necessary cost of veterinary care; and

   (ii) In the case of an injury to a pet, the reasonable and necessary cost of veterinary care.

(3) (i) "Pet" means a domesticated animal.

   (ii) "Pet" does not include livestock.

(b) *Measure of damages*. — (1) A person who tortiously causes an injury to or death of a pet while acting individually or through an animal under the person's direction or control is liable to the owner of the pet for compensatory damages.

(2) The damages awarded under paragraph (1) of this subsection may not exceed $7,500.

Petitioners contend that CJP § 11-110 applies to all torts, defines the types of compensatory damages a pet owner can recover, and limits those damages to the capped amount. In support of this argument, Petitioners refer to the statute's structure, which defines compensatory damages in the case of the death or injury of a pet, provides when a pet owner is entitled to those compensatory damages, and caps damages recoverable under the statute.

Mr. Reeves argues that, given the statute's unique definition of compensatory damages, the damages cap pertains only to reasonable and necessary veterinary care expenses and the pet's fair market value. Mr. Reeves asserts that nothing in the statute expressly limits the recovery of other possible types of damages, including pain and suffering or lost wages. He notes that the 2005 amendment removed the words "[t]he measure of damages . . . is" from the 1999 version and replaced them with "[a] person who tortiously causes an injury to or death of a pet . . . is liable to the owner of the pet for compensatory damages," as defined in the statute. Mr. Reeves argues that this indicates that the Legislature amended the statute in 2005 to allow for the recovery of noneconomic damages.

We disagree with Mr. Reeves' reading of the statute. The meaning of CJP § 11-110 is plain. CJP § 11-110(b)(1) provides that "[a] person who tortiously causes an injury to or death of a pet while acting individually or through an animal under the person's direction or control is liable to the owner of the pet for compensatory damages." Although

13

"tortiously" is not defined in the statute, negligence, gross negligence, and trespass to chattel are torts. As such, the statute applies to cases of gross negligence and trespass to chattel where the injury is to a pet.

"Maryland has long accepted the doctrine of *expressio (or inclusio) unius est exclusio alterius*, or the expression of one thing is the exclusion of another." *Comptroller v. Blanton*, 390 Md. 528, 537 (2006). Under the statute, "'Pet' means a domesticated animal" and "does not include livestock." CJP § 11-110(a)(3)(i)–(ii). The statute's definition of "Compensatory damages" in the case of the death of a "Pet" expressly states two things: "the fair market value of the pet before death" and "the reasonable and necessary cost of veterinary care." *Id.* § 11-110(a)(2)(i). Additionally, the definition uses the word "means," indicating that the Legislature intended for the list to be exhaustive. *Id.* § 11-110(a)(2); *see Hackley v. State*, 389 Md. 387, 393 (2005) ("[T]he Maryland Style Manual for Statutory Law prepared by the Department of Legislative Services . . . directs legislative drafters to '[u]se "means" if the definition is intended to be exhaustive' . . . and to '[u]se "includes" if the definition is intended to be partial or illustrative . . . .'") (second and third alterations in original).

The text evinces legislative intent to allow for certain, defined compensatory damages in the case of the tortious death or injury of a pet. Noneconomic damages, such as mental anguish and loss of companionship, are not included in the exhaustive definition of compensatory damages. As such, noneconomic damages are unavailable under the plain meaning of CJP § 11-110. The statute goes on to limit the recovery of damages under the statute to the capped amount. CJP § 11-110(b)(2).

14

We do not read the plain language of CJP § 11-110 in a vacuum. Analogous damages cap provisions in Title 11 of the Courts and Judicial Proceedings Article confirm our understanding of the text's plain meaning. Maryland's Wrongful Death Act provides a statutory cause of action for the recovery of certain economic and noneconomic compensatory damages in the case of the wrongful death of a person and strictly limits beneficiaries to spouses, parents, and children. *See* CJP § 3-904. CJP §§ 11-108 and 11-109 define and cap the availability of noneconomic and economic damages in the case of wrongful death or personal injury. The General Assembly has thus expressly provided for the recovery of noneconomic damages when a person has been wrongfully killed. *See* CJP § 11-108(a)(2)(i) ("'Noneconomic damages' means: . . . In an action for wrongful death, mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, care . . . or other noneconomic damages authorized under Title 3, Subtitle 9 of this article."). In contrast, CJP § 11-110 does not expressly provide for similar damages in the case of the wrongful death of a pet.

Mr. Reeves argues that pet owners are most like the class of people that are permitted to recover noneconomic damages under the Wrongful Death Act because of the close, familial bond between pet owners and their pets. Nevertheless, CJP § 11-110 is silent on the availability of noneconomic damages to pet owners whose pets are wrongfully killed. The Wrongful Death Act, by contrast, expressly provides for and caps the recovery of noneconomic damages when a person's spouse, child, or parent is killed. CJP §§ 3-904, 11-108. In other words, CJP § 11-110's relationship with other laws in Title 11 of the same Article does not support the anomalous result that legislative silence on the recovery of

15

noneconomic damages for the wrongful death of pets means that they are available when the Legislature has capped recovery of those damages in the case of the wrongful death of people. Mr. Reeves' reading of the statute would allow, for example, for the recovery of millions of dollars in uncapped noneconomic damages in a case involving veterinary malpractice, while noneconomic damages in a medical malpractice case remain capped. To read CJP § 11-110 in this way would produce absurd results.[7] *See Bey*, 452 Md. at 266 ("In every case, the statute must be given a reasonable interpretation, not one that is absurd, illogical or incompatible with common sense.") (citation omitted).

It would also be illogical for CJP § 11-110 to apply a cap solely on damages related to fair market value and reasonable and necessary veterinary expenses, while allowing pet owners to recover an unlimited amount of other compensatory damages for their emotional loss. Fair market value and veterinary expenses are much more easily susceptible to calculation in monetary terms than are seemingly unlimited damages for emotional pain and suffering. Indeed, in this case the jury awarded Mr. Reeves, in addition to the maximum amount allowable under CJP § 11-110 of $7,500, noneconomic damages equal to 100 times that amount.[8]

---

[7] One such result would be that a pet owner could recover noneconomic damages for the death of a pet, while that same person could not receive such damages for the loss of a best friend, sibling, fiancé(e), or grandparent. We do not dispute that the Legislature could create such a scheme, but we will not interpret it as doing so through mere silence and in the face of the statute's plain meaning.

[8] Mr. Reeves argues that recovery of other economic and noneconomic damages under CJP § 11-110 would not be limitless in this case because, at the time of the incident, the LGTCA capped those damages at $200,000. CJP § 5-303(a)(1) (2013). The LGTCA, however, would not apply in the case of veterinary malpractice, a person's dog attacking a

16

If the General Assembly's goal was to cap compensatory damages for pet owners, how strange for it to do so exclusively with respect to such a narrowly defined subset thereof. Doing so would have left all other forms of compensatory damages both uncapped and without guidelines for calculation. Unlike the Wrongful Death Act, the General Assembly did not provide a formula in CJP § 11-110 for quantifying emotional loss in the situation of the wrongful death of a pet. Our reading of CJP § 11-110 in light of the Wrongful Death Act provisions confirms our understanding that such damages are unavailable in the case of the tortious injury to or death of a pet. Certainly, the General Assembly knows how to expressly provide for noneconomic damages when it wants to, as it did with respect to the damages under the Wrongful Death Act.

We also consider CJP § 11-110's use of the term "compensatory damages" in the context of its broader meaning. Two types of damages can be recovered from a tortfeasor: compensatory damages and punitive damages. *See Beall v. Holloway-Johnson*, 446 Md. 48, 70–72 (2016). An award of compensatory damages is an "attempt to make the plaintiff whole again by monetary compensation." *Id.* at 70 (quoting *Exxon Mobil Corp. v. Albright*, 433 Md. 303, 414 (2013)). Compensatory damages "are not intended to grant to the plaintiff a windfall as a result of the defendant's tortious conduct. Thus, an award for compensatory damages must be anchored to a rational basis on which to ensure that the awards are not merely speculative." *Id.* (quoting *Albright*, 433 Md. at 414).

---

neighbor's cat, or numerous other situations covered under the statute where a private individual and not a local government is at fault. CJP § 11-110 does not distinguish between tort claims against local governments and claims against private individuals.

17

Punitive damages are designed to accomplish another goal entirely—to punish the wrongdoer for particularly egregious or heinous conduct and to deter others from following suit. *See id.* at 71–72. When the trial court in this case granted the Petitioners' motion on the issue of actual malice and punitive damages, it precluded the jury from awarding them to Mr. Reeves.[9] As a result, the only type of damages available to Mr. Reeves for the grossly negligent shooting of his dog and the trespass to his chattel are compensatory damages, which are exhaustively defined and limited by the express terms of CJP § 11-110.[10]

---

[9] The Dissent states that our reading of CJP § 11-110 would "limit *all possible* recovery" to a complainant in the case of the "injury or death of a pet." Dissent Slip Op. at 2–3. However, this case does not deal with "all possible recovery" in such cases. Rather, it deals solely with compensatory damages, as distinguished from punitive damages, and as they are defined in the statute. The statute, by its own terms, does not address punitive damages, and they are also not at issue in this case. Also not at issue here is the exception to the common law rule that allows for certain forms of noneconomic damages when property is damaged by a tortfeasor whose acts are "inspired by fraud, malice, or like motives." *See Zeigler v. F St. Corp.*, 248 Md. 223, 225–26 (1967); *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 351 (1995). This case clearly does not involve fraud, and the jury expressly found that Officer Price did not act with actual malice, i.e. "ill will or improper motivation."

[10] CJP § 11-110 was not enacted upon *tabula rasa*. Rather, it augmented well-established common law principles of recovery in cases of tortious injury to personal property. Under the common law, domestic animals such as pets have been legally classified as personal property. *E.g.*, *Moore v. Myers*, 161 Md. App. 349, 368 (2005). Furthermore, under the common law, "[t]he rule is well established that the measure of damages for the conversion or destruction of a chattel is the market value of the chattel at the time and place of the conversion or destruction." *Weishaar v. Canestrale*, 241 Md. 676, 684 (1966) (citation omitted); *Bastian v. Laffin*, 54 Md. App. 703, 714 (1983) ("The measure of damages for tortious injury to personal property is the lesser of the difference between the value of the property immediately before the harm has been done and its value immediately thereafter or the reasonable cost of repairs.").

CJP § 11-110 did not alter the common law rules of this State that pets are personal property or that noneconomic damages are generally unavailable in cases involving injury

Additionally, there can be only one recovery of damages for each injury under Maryland law. *Beall*, 446 Md. at 70; *see also Smallwood v. Bradford*, 352 Md. 8, 24 (1998) ("Duplicative or overlapping recoveries in a tort action are not permissible."); *Francis v. Johnson*, 219 Md. App. 531, 561 (2014) ("The Maryland appellate courts have made clear that there can be only one recovery of damages for one wrong or injury."). We have explained that "[u]nder the Maryland rules, [d]ifferent legal theories for the same recovery, based on the same facts or transaction, do not create separate claims." *Beall*, 446 Md. at 70 (second alteration in original) (internal quotation marks and citation omitted). "The existence of multiple claims ultimately depends upon whether the 'aggregate of the operative facts' presented states more than one claim which can be separately enforced." *Id.* at 70–71 (citation omitted).

Here, Mr. Reeves' gross negligence and trespass to chattel claims are premised on the same set of operative facts. They are thus alternative legal theories for the same recovery. Therefore, Mr. Reeves is entitled to one recovery as compensation. Notwithstanding the fact that Mr. Reeves suffered a tragic loss, the only injury before us for which Mr. Reeves can recover is the death of his dog, because the jury awarded no damages for the constitutional harms.

---

to personal property. *See Robinson v. State*, 353 Md. 683, 693 (1999) ("It is a generally accepted rule of law that statutes are not presumed to repeal the common law 'further than is expressly declared, and that a statute, made in the affirmative without any negative expressed or implied, does not take away the common law.'") (citation omitted). Rather, CJP § 11-110 merely codified the existing recovery rule in cases involving pets, allowed for an additional and limited form of damages in the way of defined veterinary expenses, including veterinary expenses that exceed the pet's fair market value, and capped all available compensatory damages.

In this way, this case is distinguishable from the decision in *Brooks v. Jenkins*, on which Mr. Reeves relies. In *Brooks*, the Court of Special Appeals explained the scope of its holding as follows: "We hold only that [CJP § 11-110] *does not* limit the Jenkinses' total recovery for the constitutional tort to the capped value of their pet's vet bills." 220 Md. App. at 471. Here, CJP § 11-110 did not work to cap Mr. Reeves' constitutional claim damages to the value of veterinary bills or Vern's fair market value. Rather, the jury awarded no damages at all for those claims. *See Reeves*, 2019 WL 5606605, at *13 (Friedman, J., dissenting) ("The jury assigned no value to the denial of Mr. Reeves' constitutional rights. The jury did, however, assign a value to the destruction of Mr. Reeves' dog. Therefore, the injury to the dog is the only injury upon which Mr. Reeves can recover."). As a result, the analysis of *Brooks* is inapposite,[11] and the only injury for which Mr. Reeves can recover is the death of his dog, which is limited to the capped amount in CJP § 11-110.

---

[11] In the 2020 and 2021 legislative sessions, "Buddy's Law" was cross-filed in the House and Senate. The bills propose to increase the current damages cap in CJP § 11-110 from its current amount of $10,000 to $25,000. S. 292, 2021 Leg., 442nd Sess. (Md. 2021); H.D. 154, 2021 Leg., 442nd Sess. (Md. 2021); S. 997, 2020 Leg., 441st Sess. (Md. 2020); H.D. 992, 2020 Leg., 441st Sess. (Md. 2020). On March 2, 2021, after oral argument, Mr. Reeves' counsel submitted a letter to this Court regarding committee hearings in the 2021 legislative session on the proposed amendments. Mr. Reeves' counsel wrote that certain comments made "demonstrate conclusively that the legislature is well aware of the *Brooks* case" and "[n]o effort has been made this session, or at any other time since 2014, to legislatively overturn *Brooks*." Even if, for the sake of argument, we were to view the Legislature as acquiescing to *Brooks*, the holding in *Brooks* deals with damages awarded to pet owners for the violations of their constitutional rights, which the jury did not award in this case.

The Dissent contends that we have passed on the opportunity to change Maryland's common law to expand the damages available in the case of the tortious death or injury of a pet, in line with a minority modern trend. *See* Dissent Slip Op. at 5–6, 9–13. However, no such opportunity is before us. The issue in this case is not whether our common law is or should be in line with modern sensibilities regarding pets. Also not before us is the issue of whether Maryland law classifying pets as personal property should be changed. *See* Dissent Slip Op. at 14–15. Rather, this case presents the narrow issue of whether CJP § 11-110, which defines all compensatory damages in cases involving the injury to or death of a pet, can also be read to allow for types of damages it leaves out of that exhaustive definition. We conclude that the statute cannot be read in such a manner.

The Legislature may wish to amend CJP § 11-110 in response to the various policy arguments in this case in order to allow for other forms of compensatory damages in cases involving the tortious injury or death of pets.[12] However, under the statute in its current form, such damages are strictly limited to the two forms provided. If the Legislature intended to compensate pet owners for noneconomic damages associated with the tortious death of their pets, it would have stated so plainly in the language of CJP § 11-110.

---

[12] One such policy argument is that advanced by the Maryland Veterinary Medical Association, the American Kennel Club, the Cat Fanciers' Association, the Animal Health Institute, the American Veterinary Medical Association, the National Animal Interest Alliance, the American Pet Products Association, the American Animal Hospital Association, and the Pet Industry Joint Advisory Council, who submitted an *amici curiae* brief with this Court. Therein, they stated that if awards of noneconomic damages are permitted for negligence, the cost of veterinary care, pet food and other products, and other pet services would increase to accommodate the new liability, and pet owners might not be able to afford these necessary products and services. Such policy considerations are the proper province of the Legislature.

In sum, the plain meaning of CJP § 11-110 is that it defines what compensatory damages are available in the case of the tortious injury to or death of a pet and limits the total amount that may be recovered. It does not allow for recovery of other forms of compensatory damages not expressly included therein.

## 2. Legislative History

The legislative history of CJP § 11-110 also comports with our understanding of its plain language. "While not necessary in every instance, we often find it prudent to scrutinize the legislative history to confirm that our interpretation of the statute's plain language accords with the legislature's intent." *Berry v. Queen*, 469 Md. 674, 687–88 (2020). The "ends to be accomplished" by the statute in this case were to hold tortfeasors liable for pet owners' veterinary expenses in addition to the fair market value of the pet. As explained in a 1989 Senate Floor report, the General Assembly enacted CJP § 11-110 in response to a case where a trial court awarded only $600 in damages to a dog owner whose dog was attacked and injured by another dog, even though the injured dog's veterinary bills cost $1,900. The 1989 version of the statute expressly permitted a pet owner to recover veterinary expenses up to $2,500. S. 595, 1989 Leg., 399th Sess. (Md. 1989). In 1999, the Legislature amended the statute to increase the damages cap to $5,000 and to apply in the case of the death of a pet. H.D. 214, 1999 Leg., 413th Sess. (Md. 1999).

In 2001, House Bill 907 proposed amending the statute to allow recovery for certain noneconomic damages up to $25,000. The bill would have excluded licensed veterinarians providing medical assistance and nonprofit employees from such liability. H.D. 907, 2001 Leg., 415th Sess. (Md. 2001). House Bill 907 did not pass. In 2002, House Bill 221, which

22

would have provided for the recovery of noneconomic damages in the case of the intentional death of a pet, likewise capped at $25,000, also did not pass. H.D. 221, 2002 Leg., 416th Sess. (Md. 2002).

Petitioners argue that these bill failures indicate that the Legislature did not intend to allow for noneconomic damages for the injury to or death of a pet. Mr. Reeves argues that the bill failures mean the opposite, i.e. the 2005 version enacted years later provided for the recovery of those damages. On the contrary, these bill failures indicate to us that the Legislature did not intend for the statute to include noneconomic damages as compensatory damages in the case of injury to or death of a pet.

We recognize that "the fact that a bill on a specific subject fails of passage in the General Assembly is a rather weak reed upon which to lean in ascertaining legislative intent." *City of Baltimore Dev. Corp. v. Carmel Realty Assocs.*, 395 Md. 299, 329 (2006) (citation omitted). However, whether a proposed amendment failed "can be useful sometimes in ascertaining or confirming legislative intent." *Antonio v. SSA Sec., Inc.*, 442 Md. 67, 87 (2015). Here, amendments that would have expressly provided for the recovery of noneconomic damages and capped their recovery at $25,000 failed. It does not follow that the Legislature intended CJP § 11-110 to allow for uncapped noneconomic damages when even the proposed bills in favor of allowing noneconomic damages would have capped their recovery, one of which would have also exempted veterinarians from liability.

In 2005, the Legislature enacted House Bill 941, substantively amending CJP § 11-110. The 2005 amendment provided that a person who causes an injury to or death of a pet in tort "is liable to the owner of the pet for compensatory damages," defined

23

compensatory damages, and capped recovery of those damages at $7,500.  H.D. 941, 2005 Leg., 420th Sess. (Md. 2005).

The Floor Report to House Bill 941 summarized the 2005 amendment to the statute as altering the damages that may be awarded for injuries to or death of a pet, increasing the cap on damages from $5,000 to $7,500, and "allow[ing] a pet owner to recover both the fair market value of the pet *and* the cost of veterinary care in the case of the death of the pet."  Floor Report, H.D. 941, 2005 Leg., 420th Sess. (Md. 2005).  It was clear that the bill was intended to provide compensation for injuries to a pet and allow for veterinary expenses capped at a certain amount—not to allow the pet owner to recover uncapped noneconomic damages for the injury to or death of a pet.  The bill thus recognized that the replacement value of a pet that is injured or killed includes the cost of life-saving veterinary care.

Following House Bill 941, there were no other substantive changes to the statute until 2017, when the Legislature increased the damages cap to $10,000.  S. 143, 2017 Leg., 437th Sess. (Md. 2017).  Thus, the legislative history supports our reading of CJP § 11-110.

*B.  Sufficiency of the Evidence of Gross Negligence*

We turn now to whether the jury had sufficient evidence to reach a finding of gross negligence against Officer Price and the circuit court's denial of the Petitioners' motion for judgment notwithstanding the verdict.  "An appellate court reviews the trial court's decision to allow or deny judgment or [judgment notwithstanding the verdict] to determine whether it was legally correct, while viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party."  *Jones v. State*,

24

425 Md. 1, 30–31 (2012) (alteration in original) (citation omitted).  This Court affirms the denial of a motion for judgment notwithstanding the verdict "if there is 'any evidence, no matter how slight, that is legally sufficient to generate a jury question.'"  *Id.* at 31 (citation omitted).  Furthermore, if "the nonmoving party offers competent evidence that rises above speculation, hypothesis, and conjecture, the [judgment notwithstanding the verdict] should be denied."  *Cooper v. Rodriguez*, 443 Md. 680, 706 (2015) (alteration in original) (citation omitted).

"Issues involving gross negligence are often more troublesome than those involving malice because a fine line exists between allegations of negligence and gross negligence."  *Stracke v. Estate of Butler*, 465 Md. 407, 420 (2019) (quoting *Barbre v. Pope*, 402 Md. 157, 187 (2007)).  Gross negligence is "something *more* than simple negligence, and likely more akin to reckless conduct."  *Barbre*, 402 Md. at 187 (citation omitted).  It is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them."  *Id.* (citation omitted).  Additionally, "a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist."  *Id.* (citations omitted).

In *Brooks v. Jenkins*, the Court of Special Appeals held that the trial court did not err by permitting the jury to decide whether the deputy was grossly negligent when he shot the Jenkinses' family dog.  220 Md. App. at 461–62.  *Brooks* observed that "the trial court in this case properly denied the motion for judgment so long as the Jenkinses introduced

25

evidence sufficient to permit the jury to infer that Deputy Brooks acted either with the intent to inflict injury or with 'utter indifference' to the rights of others." *Id.* In *Brooks*, the court noted that there was no evidence the dog was a vicious animal or posed a threat; the video recording from the deputy's body camera showed the dog's tail wagging as it approached the deputy, and the dog did not approach the deputy with speed or in a crouched position; and the video recording showed the deputy point his gun directly at the dog's chest and shoot, rather than use lesser force. *Id.* at 462. The court stated that "the evidence sufficed to support the jury's finding that the Deputy overreacted to the potential threat, responded with excessive force, and acted with reckless indifference, and the court was correct to allow the jury to make that decision." *Id.*

Here, the jury was presented with more than evidence of "simple negligence." When "viewing the evidence and the reasonable inferences to be drawn from it in the light most favorable to the non-moving party," there was sufficient evidence for a juror to have drawn the rational inference that Officer Price acted with utter indifference towards Mr. Reeves' rights when Officer Price shot his dog twice. *See Jones*, 425 Md. at 30–31. The facts in evidence rose above mere "speculation, hypothesis, and conjecture" that Officer Price was grossly negligent. *See Cooper*, 443 Md. at 706.

The jury was presented with Officer Price's testimony, the testimony of the Reeves family, and the recorded video testimony of Dr. Lahmers, a veterinary pathologist expert. The jury also had the opportunity to view the photographs. As in *Brooks*, there was sufficient evidence for the jury to have rationally found that Officer Price was grossly negligent when he shot Mr. Reeves' dog. Dr. Lahmers testified that Vern could only reach

26

a person's mid-stomach while standing on hind legs. This contradicted Officer Price's testimony that the dog's paws were resting on his forearm at neck level. Photographs magnified 300 times depicted mud on Officer Price's pant legs, not on his upper uniform, as he had claimed, indicating inconsistencies in Officer Price's account of events.

Officer Price admitted at trial that, as he approached Mr. Reeves' residence, he had no suspicions that the family was involved with the burglaries that he was investigating. He also admitted that it appeared the home was occupied at the time. Officer Price was not on Mr. Reeves' property in order to serve a warrant or look for a suspect. By his own account, Officer Price saw that lights were on in the house, the windows were up, and the front door was open. He was taking notes in front of Mr. Reeves' residence when the dog approached him. Officer Price discharged his weapon at the dog while standing in front of the home in the middle of the afternoon. Additionally, like in *Brooks*, there were other non-lethal measures he could have taken. Officer Price could have used his taser, baton, or mace, or made verbal commands.

Although Officer Price testified that Vern was growling and barked once as the dog approached him, a reasonable juror could have found, as this jury did, that the dog did not attack him. The jury heard conflicting accounts from Officer Price and Dr. Lahmers as to how the dog was positioned when shot. Whereas Officer Price recalled that the dog's paws were on his arm when he fired the shots, Dr. Lahmers testified that the dog was turned away from the officer when one of the shots was fired. Furthermore, like in *Brooks*, there was no evidence that Vern was vicious or threatening. Testimony at trial indicated that

27

Vern had no history of aggression and got along with the neighbors, young children, and other animals.

Accordingly, viewing the facts in the light most favorable to Mr. Reeves, we agree with the Court of Special Appeals that Mr. Reeves presented sufficient evidence at trial for a rational juror to find that Officer Price was grossly negligent. Thus, we uphold the circuit court's denial of the Petitioners' motion for judgment notwithstanding the verdict. However, despite the fact that there was sufficient evidence on the gross negligence claim, as explained above Mr. Reeves' damages are limited to $7,500 for his claims, as both the trespass to chattel claim and the gross negligence claim sought recovery for the same harm and both are torts covered by CJP § 11-110. Thus, consistent with the jury's award and the circuit court's reduction of the award, Mr. Reeves is limited to $7,500 on his trespass to chattel claim, and $0 on his alternative gross negligence claim.

## III.

## Conclusion

In light of CJP § 11-110's plain language and structure, its relationship with the Wrongful Death Act, and its legislative history, we conclude that the statute defines and caps the recovery of compensatory damages in the case of the tortious death or injury of a pet. Construing CJP § 11-110 to allow recovery for additional undefined and uncapped compensatory damages, including lost wages and mental anguish, would produce illogical results. Accordingly, we reverse the judgment of the Court of Special Appeals on the statutory construction issue.

28

Further, we affirm the judgment of the Court of Special Appeals on the gross negligence issue. There was sufficient evidence at trial for the jury to find that Officer Price acted with gross negligence by shooting Mr. Reeves' dog. When viewing the evidence and the reasonable inferences to be drawn from them in the light most favorable to the nonmoving party, a rational juror could have found that Officer Price acted willfully or with utter indifference towards Mr. Reeves' rights, and thus, was grossly negligent. However, pursuant to the single recovery rule and CJP § 11-110, we reduce the total damages award to $7,500, consistent with the statutory cap at the time that this cause of action arose.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART. COSTS TO BE DIVIDED EQUALLY BETWEEN PETITIONERS AND RESPONDENT.**

Circuit Court for Anne Arundel County
Case No. C-02-CV-15-002956
Argued: September 11, 2020

IN THE COURT OF APPEALS
OF MARYLAND

No. 68

September Term, 2019

_____

ANNE ARUNDEL COUNTY,
MARYLAND AND RODNEY PRICE

v.

MICHAEL H. REEVES

_____

Barbera, C.J.,
McDonald,
Watts,
Getty,
Hotten,
Booth,
Biran,

JJ.

_____

Dissenting Opinion by Hotten, J.

_____

Filed: June 7, 2021

For while we have our eyes on the future[,]
history has its eyes on us[.]
This is the era of just redemption[.]
We feared at its inception[.]
We did not feel prepared to be the heirs
of such a terrifying hour
but within it we found the power
to author a new chapter[.][1]

Respectfully, I dissent. The Majority interpreted Md. Code Ann., Courts and Judicial Proceedings ("Cts. & Jud. Proc.") § 11-110 to preclude the recovery of noneconomic damages for a pet dog killed as a result of gross negligence. The Majority need not have reached its conclusion under a narrow construction of the statute and Maryland common law. Assuming *arguendo* that our controlling authority mandated the result found in the Majority opinion, the ineffable societal value ascribed to pets warrants a reassessment of Maryland law that continues to treat cherished family pets as mere chattel.

***The Majority's interpretation of Cts. & Jud. Proc. § 11-110 unnecessarily eliminates a plaintiff's right to recover damages for grossly negligent harm to property under Maryland common law.***

Generally, a plaintiff may not recover emotional or non-economic damages for *negligently caused* personal or real property loss. *Dobbins v. Washington Cty. Suburban Sanitary Comm'n*, 338 Md. 341, 351, 658 A.2d 675, 679-80 (1995) ("it remains the law of Maryland that a plaintiff cannot ordinarily recover for emotional injuries sustained solely as a result of negligently inflicted damage to the plaintiff's property."); *H & R Block, Inc.*

---

[1]     Amanda Gorman, *The Hill We Climb*, The Hill, https://thehill.com/homenews/news/535052-read-transcript-of-amanda-gormans-inaugural-poem (Jan. 21, 2021), archived at https://perma.cc/YR5V-WGZX.

*v. Testerman*, 275 Md. 36, 48-49, 338 A.2d 48, 55 (1975) ("Maryland decisions have generally denied compensation for mental anguish resulting from damage to property.").

Acts "inspired by fraud, malice, or like motives[]" provide a major exception to this general rule. *Ziegler v. F St. Corp.*, 248 Md. 223, 226, 235 A.2d 703, 705 (1967) (highlighting emotional damages motivated by fraud or malice are recoverable even in the absence of physical impact); *State*, *for Use of Aronoff v. Balt. Transit Co.*, 197 Md. 528, 539, 80 A.2d 13, 18 (1951). A defendant who commits tortious acts to property beyond mere negligence can be held liable for emotional damages. *See Aronoff*, 197 Md. at 538, 80 A.2d at 17 (citing *Buchanan v. Stout*, 123 A.D. 648, 108 N.Y.S. 38 (1908) (holding that the plaintiff cannot recover for the tortious death of her cat without a showing of *willful or grossly negligent*[2] behavior)).

The Majority affirmed in part the Court of Special Appeals' holding that Officer Price acted with gross negligence when he shot and killed Vern, but the Majority reversed in part the Court's holding that Cts. & Jud. Proc. § 11-110 permits recovery of emotional damages that arise from grossly negligent harm to pets. The Majority reads the statute's

---

[2] This Court has defined "gross negligence" as

[a]n intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting *the life or property* of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. . . . A wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to rights of others that he acts as if such rights do not exist.

*Taylor v. Harford Cty. Dept. of Soc. Services*, 384 Md. 213, 228, 862 A.2d 1026, 1034 (2004) (citations omitted) (emphasis added).

$10,000 compensatory damage cap to limit *all possible* recovery for an injury or death of a pet.

The Majority did not have to reach this conclusion and should have concluded that pets killed or injured with gross negligence may permit the recovery of emotional damages. We are bound to interpret statutes that displace common law as narrowly as possible. *See generally Robinson v. State*, 353 Md. 683, 728 A.2d 698 (1999) (noting that statutes in derogation of the common law are to be construed narrowly, so as to not make any change beyond that which is expressly stated and necessary). To date, Maryland common law has not clearly specified whether gross negligence is equivalent to "fraud, malice, or like motives" especially in the context of tortious harm to pets. This Court has noted that there is not a consistent usage of gross negligence across "more than twenty-five appearances in our statutes[.]" *Taylor*, 384 Md. at 227, 862 A.2d at 1034.[3] This Court in some instances equated gross negligence with "fraud, malice, or like motives" in the past,[4] which

---

[3] *See, e.g.*, Md. Code Ann., Insurance § 5-201(j)("Except for fraud, willful misconduct, or gross negligence, a qualified actuary is not liable for damages . . ."); Md. Code Ann., Business, Occupations & Professions § 3-311(a)(1)(iii) (revoking an architecture license if applicant or licensee "is guilty of any fraud, gross negligence, incompetence, or misconduct. . ."); Md. Code Ann., Natural Resources § 8-716.1(f)(1) (waiving statute of limitations for personal tax debt if "proof of fraud or gross negligence. . .").

[4] *Cooper v. Rodriguez*, 443 Md. 680, 710, 118 A.3d 829, 846 (2015) (holding corrections officer acted with gross negligence to lose immunity under Maryland Tort Claims Act); *Booth v. Robinson*, 55 Md. 419 (1881) (holding directors of a corporation breach their fiduciary duty through gross negligence in the same way directors would be for fraud); *see also Ford v. Balt. City Sheriff's Office*, 149 Md. App. 107, 120-21, 814 A.2d 127, 134 (2002) (if "the State employee has acted with *malice or gross negligence*, . . . the State is immune from suit and the injured party may only bring a viable tort claim against

(continued . . .)

3

according to longstanding precepts of Maryland common law may render a tortfeasor liable for emotional damages for damage to property. *Arnoff*, 197 Md. at 539, 80 A.2d at 18. It would have been sound, especially given the strong emotional bond between people and pets, for the Majority to recognize an additional exception to the common law that grossly negligent harm to pets may entail liability for emotional damages. Pets, particularly dogs, possess individual personalities, emotions, intelligences, and behaviors.[5] Maryland law should distinguish between the recovery of grossly negligent harms to pets and inanimate objects accordingly.

  a.  <u>The Majority's holding creates a double anomaly in Maryland law</u>.

Pets already hold an anomalous position within Maryland law. They are the only type of "property" with capped *compensatory* damages. The Majority's decision places pets in a doubly anomalous position: they are the only type of property subject to a compensatory and non-compensatory cap. A tortfeasor may "wantonly and willfully" shoot and kill a beloved, family dog, "utterly indifferent" to the family's emotional bond and pay no more than $10,000 in damages, while a fraudster who intentionally tricks a

_____

(. . . continued)

the State employee.") (emphasis added); *but see Ellerin v. Fairfax Sav., F.S.B.*, 337 Md. 216, 228, 652 A.2d 1117, 1123 (1995) (precluding gross negligence as a basis for punitive damages in non-intentional tort cases).

  [5] News and social media are replete with stories that reinforce common experience and understanding of pets as cherished companions. *See, e.g.*, The Dodo, http://www.thedodo.com (last visited May 25, 2021), archived at https://perma.cc/V52M-TRHK.

4

family into selling a painting of their dog would face uncapped compensatory damages and punitive damages.

The Majority's decision also creates an incongruous result where a person can be *criminally liable* for neglecting their pet under Maryland's animal cruelty law, Md. Code Ann., Criminal Law § 10-601(c)(1) ("'Cruelty' means the unnecessary or unjustifiable physical pain or suffering caused or allowed by an act, omission, or neglect[]"), but if *someone else kills* one's pet with gross negligence, they will only face a maximum compensatory damage penalty of $10,000.

      b. <u>The Majority's decision contrasts with the modern trend of our sister jurisdictions that have expanded pet owners' ability to recover for injured or killed pets.</u>

The Majority's decision stands at odds with the modern trend of our sister jurisdictions that have recognized a greater right of recovery for injured or killed pets. More than fifty years ago, the Florida Supreme Court held in *LaPorte v. Associated Independents, Inc.* that "the malicious destruction of the pet provides an element of damage for which the owner should recover, irrespective of the value of the animal[.]" 163 So. 2d 267, 269 (Fla. 1964). The plaintiff saw a garbage collector throw a trash can at her dog, Heidi. *Id.* at 268. The garbage collector laughed and drove away. *Id.* Heidi died from the impact. *Id.* The trial court limited the plaintiff's recovery to the fair market value of the dog. *Id.* at 269. The Florida Supreme Court reversed recognizing the "very real" affection between a person and their pet. *Id.*

Similar decisions have since been reached in Alaska, California, Florida, Hawaii, Idaho, Kentucky, Puerto Rico and Washington. *See, e.g.*, Jay M. Zitter, Annotation,

5

*Recovery of Damages for Emotional Distress Due to Treatment of Pets and Animals*, 91 A.L.R. 5th 545 § 3 (2001) (annotating various jurisdictions' laws that allow for recovery of emotional damages for an injured or killed pet). In *Plotnik v. Meihaus*, 208 Cal. App. 4th 1590, 146 Cal. Rptr. 3d 585 (4th Dist. 2012), the plaintiffs sued their neighbor after he allegedly struck their 12-inch tall miniature pinscher with a baseball bat after the dog dashed into the neighbor's yard. *Id.* at 1605, 146 Cal. Rptr. at 598. The California Court of Appeal for the Fourth District held:

> We believe good cause exists to allow the recovery of damages for emotional distress under the circumstances of this case . . . . [W]hile it has been said that [dogs] have nearly always been held to be entitled to less regard and protection than more harmless domestic animals, it is equally true that there are no other domestic animals to which the owner or his family can become more strongly attached, or the loss of which will be more keenly felt. Additionally, one can be held liable for punitive damages if he or she willfully or through gross negligence wrongfully injures an animal.

*Id.* at 1607, 146 Cal. Rptr. 3d at 600 (internal citations and quotation omitted).

The court based its decision on California's civil code that permits recovery of exemplary damages or "damages for the sake of example and by way of punishing the defendant[]" for malicious, oppressive, or fraudulent conduct. Cal. Civ. Code § 3294 (1992). These conditions for granting relief to an injured pet in California closely parallel Maryland's common law basis of recovering emotional damages for property in Maryland. *See Ziegler*, 248 Md. at 226, 235 A. at 705 (allowing recovery of emotional damages for harms to real property "inspired by fraud, malice, or like motives[]"). By permitting the recovery of emotional damages for injuries or death sustained by pets, as a result of grossly

negligent conduct, we would have joined a modern trend among sister jurisdictions that recognize the close emotional bond humans share with their pets.

***The Majority's interpretation contravenes the General Assembly's legislative purpose to* expand *the amount a plaintiff may recover for tortious harms to their pet.***

In 1989, the General Assembly originally enacted the predecessor to Cts. & Jud. Proc. § 11-110 to expressly allow a plaintiff to recover for harms to his or her pet. *Brooks v. Jenkins*, 220 Md. App. 444, 468, 104 A.3d 899, 913 (2014) (stating that the original statute's purpose was to "establis[h] a certain method for the measurement of damages to an injured pet" and to clarify a plaintiff's right to recover for an injured pet). Veterinarian bills usually exceeded a pet's fair market value, so the statute ensured that plaintiffs would not suffer the unjust result of paying for extensive veterinarian bills, while the tortfeasor only had to pay for the pet's replacement cost.[6] The General Assembly also recognized that, unlike the decision to repair or replace other personal property, pet owners do not view veterinarian care as a discretionary expense.

The predecessor to Cts. & Jud. Proc. § 11-110 eliminated the unjust result and recognized veterinary care as a recoverable form of compensatory damages to pets. It also *reversed the common law* lesser alternative valuation of market value or cost of repair. *See*

---

[6] Senator Zirkin, sponsor of SB 143, the 2017 amendment to Cts. & Jud. Proc. § 11-110, shared an anecdote from a constituent during the Second Reading of SB 143 in which a tortfeasor shot the plaintiff's dog, but the plaintiff bore most of the cost of the dog's veterinarian treatment. Similar stories motivated, in part, the original enactment of the predecessor to Cts. & Jud. Proc. § 11-110. Injury to or Death of Pets – Damages, S.B. 143, Second Reading, 2017 Sess. (Md. 2017), http://mgaleg.maryland.gov/mgawebsite/FloorActions/Media/senate-19-?year=2017RS, archived at https://perma.cc/5XXT-JTXN (hereinafter S.B. 143 Second Reading).

*Bastian v. Laffin*, 54 Md. App. 703, 714, 460 A.2d 623, 629 (1983) ("The measure of damage for tortious injuries to personal property is *the lesser of the difference* between the value of the property immediately before the harm has been done and its value immediately thereafter or the reasonable cost of repairs") (emphasis added). Now, plaintiffs may recover whichever *"is greater"*: fair market replacement value or "reasonable cost of veterinary care." Subsequent amendments only reinforced and strengthened the plaintiff's right to recovery by increasing the compensatory damages cap.

The legislative history of the 2017 amendment to Cts. & Jud. Proc. § 11-110 (increasing the compensatory damage cap from $7,500 to $10,000) further illustrates the intent of the General Assembly to expand Marylanders' right to recover for harms inflicted on their pets. Senator Zirkin testified that he sponsored the amendment because the previous "arcane" cap created the anomalous result that a plaintiff may recover for a destroyed vase, but "for some random reason it says [a pet] is valued no more than $7,500." Senator Zirkin expressed the intent and animating spirit of the amendment in no uncertain terms:

> If I shot your painting worth $10,000, I would get more money than if I shot your dog. . . . This seems outrageous . . . it seemed particularly cruel to call [what we consider] a family member just an object and then put an arbitrary cap on what it's worth. It seems inane to me.

S.B. 143 Second Reading.

The General Assembly also knew of the Court of Special Appeals' recognition of recovery of emotional damages for an injured pet under Cts. & Jud. Proc. § 11-110 in *Brooks*, but declined to overturn the decision through amendment. This Court presumes

8

awareness and acceptance of a law's interpretation when the General Assembly "re-enacts the statute without changing in substance the language at issue." *Plein v. Dep't of Labor*, 369 Md. 421, 437, 800 A.2d 757, 767 (2002). The Court of Special Appeals decided *Brooks* in 2014, which held Cts. & Jud. Proc. § 11-110 cannot limit a plaintiff's overall recovery of the underlying tort. 220 Md. App. at 469, 104 A.3d at 913-14.

This Court need not rely on a presumption to draw the conclusion that the General Assembly knew and tacitly approved of *Brooks*. During a hearing of SB 143, Kelley Donohue, on behalf of the Maryland Association for Justice, expressly referenced *Brooks* in her testimony. The legislators knew of a plaintiff's ability to recover other damages under a theory of gross negligence in *Brooks* and subsequently amended the statute without changing the compensatory damages language or disturbing the right of a plaintiff to recover for emotional damages for a pet harmed through gross negligence. I would have interpreted the legislative history of Cts. & Jud. Proc. § 11-110 as supporting an expansion, not restriction, of a plaintiff's right to recover emotional damages for grossly negligent harm to a pet.

### The Majority's decision missed an opportunity to bring Maryland's common law in line with Marylanders' love for their pets.

Marylanders have strong emotional bonds with their pets, especially their dogs. Most people, including Mr. Reeves, considered his dog a part of the family and "his best friend in the world[.]" The designation of dogs as mere personal property belies common experience, cultural values, and societal expectations. Treating dogs as mere property also erases a dog's intrinsic attributes as a living being and the irreplaceable instinct to love and

protect human companions. A dog, unlike an inanimate object, welcomes its human companion after a day at work, protects its human companion when in danger, and exhibits behavior and emotions that is consistent with grief and distress when its human companion is ill, injured, or passes away. Given prevailing societal values, attitudes, and norms, it no longer appears tenable to deny emotional damages for a cherished family dog, killed with gross negligence, in the same way that the common law precludes emotional damages for an inanimate object that was accidentally broken. *See Unger v. State*, 427 Md. 383, 417, 48 A.3d 242, 262 (2012) (adjusting the common law to accord with modern societal values, conditions, and interests).

Marylanders can no longer rely on *Brooks* to vindicate the loss of a cherished pet companion. The Majority's decision comes at a time when pet ownership is surging. The 2019-2020 National Pet Owners Survey estimated 67% of U.S. households have a pet, up from 56% in 1988. This data omits the recent uptick following the Covid-19 global pandemic. Kim Kavin, *Dog Adoptions and Sales Soar During the Pandemic*, The Washington Post (Aug. 12, 2020). Pet adoption has always provided more than just companionship, it establishes a connection and unconditional love. KK Ottesen, *Humane Society President Discusses the Surge of Pet Ownership During the Pandemic – And What Animals Can Teach Us*, The Washington Post (Apr. 27, 2021) ("[Animals] provide [connection and unconditional love]. That's who they are. That's what they do.").

The Majority has missed an opportunity to recognize pets, not just as emotive, intelligent, loving, and cherished members of our families, but as representing more than mere personal property. In the past, courts did not wait for legislative enactment to expand

10

the concept of personage when societal needs, values, and interests demanded it. This Court can break from precedent when "passage of time and evolving events" render it "archaic or inapplicable to modern society[.]" *State v. Stachowski*, 440 Md. 504, 520, 103 A.3d 618, 627 (2014). Greater legal protection of beloved family pets is long overdue.[7]

The average Marylander may be surprised to hear that while the law treats a caring, loyal, and vivacious pet dog as personal property, it treats a corporation as a person. Common law has recognized corporate personhood for centuries. *Cook Cty., Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125, 123 S. Ct. 1239, 1244 (2003) ("There is no doubt that the term [person] then extended to corporations, the Court in 1826 having

---

[7] The perpetuation of Maryland common law's categorization of pets as personal property, despite prevailing societal sentiment, calls to mind a vigorous dissent from Judge Starcher of the West Virginia Supreme Court:

> This opinion is simply medieval. The majority blithely says that "our law categorizes dogs as personal property"—that "damages for sentimental value, mental suffering, and emotional distress are not recoverable" when one's pet is injured or killed by the negligence of another person. In coming to this conclusion, the majority overlooks the fact that the "law" in question is the common law which is controlled by this Court. There was nothing stopping the majority from changing that common law other than their lack of concern for pet owners and the emotional bonds that exist between owners and their pets. When the common law of the past is no longer in harmony with the institutions or societal conditions of the present, this Court is constitutionally empowered to adjust the common law to current needs. . . . As Justice Holmes succinctly reflected, "[t]he common law is not a brooding omnipresence in the sky but the articulate voice of some sovereign or quasisovereign that can be identified." . . . Yet the majority opinion continues to maintain the primitive limits of the common law, and refuses to adjust to the realities of the modern world, and permit recovery of damages for sentimental values, mental suffering, or emotional distress.

*Carbasho v. Musulin*, 217 W. Va. 359, 363, 618 S.E.2d 368, 372 (2005) (Starcher, J., dissenting).

11

expressly recognized the presumption that the statutory term 'person' 'extends as well to persons politic and incorporate, as to natural persons whatsoever.'") (quoting *United States v. Amedy*, 24 U.S. 392, 400 (1826)) (other quotations omitted); *see also Trustees of Dartmouth College v. Woodward*, 17 U.S. 518, 667 (1819) (opinion of Story, J.) (A corporation "is, in short, an artificial person, existing in contemplation of law, and endowed with certain powers and franchises which, though they must be exercised through the medium of its natural members, are yet considered as subsisting in the corporation itself, as *distinctly as if it were a real personage*.") (emphasis added).

The average Marylander may be more surprised to hear that the law has recognized a *boat*, or more precisely, a vessel, as a legal person. *Ralli v. Troop*, 157 U.S. 386, 403, 15 S. Ct. 657, 664 (1895) (affirming "a distinct principle of the maritime law, namely, that *the vessel*, in whosesoever hands she lawfully is, *is herself considered the wrongdoer*, liable for the tort, and subject to a maritime lien for the damages") (emphasis added). Even though vessels constitute inanimate amalgamations of mostly steel, aluminum, fiberglass and timber, the law endows the vessel with a legal personality (usually gendered as female) and empowers "her*"* recovery for tort damages.

The common law extended recognition of legal personage to what the average person would consider property not because people loved corporations and vessels more than their pets. Instead, legal, commercial, and societal interests demanded it. "[A]nything can be made a legal unit, and the subject of rights and duties, a fund, a building, a child unborn, a family. There is no reason, except the practical one, why, as someone has suggested, the law should not accord to the last rose of summer a legal right not to be

12

plucked." Jeffery S. Kerr, et al., *A Slave by Any Other Name is Still a Slave*, 19 Animal L. 221, 226 (2013) (quoting Gerard Cark Gebdersib, *The Position of Foreign Corporations in American Law* (Harvard U. Press 1918)) (footnote omitted).

Similarly, extending legal personhood to pets on a limited basis to recover for emotional damages for the pet's grossly negligent injury or death could present an incremental change to Maryland tort law. More importantly, it serves to dignify the deep emotional connection between humans and their pets and underscores a widely shared belief in modern society that animals are not chattel, but members of the family.[8]

The law should similarly extend a recognition of limited personhood to pets, if only so their human companions can seek recovery for grossly negligent conduct that caused injury or death to that pet. The law should reflect the importance and centrality of pets to individual families and society as a whole. It has already done so for multinational corporations and vessels. Pets deserve similar treatment.

### Formalistic adherence to classifying pets as property dredges up the law's ignominious history of treating living beings, notably slaves and women, as property not legal persons.

The designation of pets under the common law as mere personal property deprives pets the dignity of living beings. When Maryland became a state in 1788, it formally inherited the common law of England, which still considered slaves, women, and pets as

---

[8] The law already allows a mother, who sustains personal injury, and as a result of the negligent conduct of another, suffers the loss of a fetus, to recover emotional damages for the death of an unborn child. *Smith v. Borello*, 370 Md. 227, 247, 804 A.2d 1151, 1163 (2002) (holding that a mother may recover demonstrable emotional distress that accompanies and is attributable to the loss of the fetus and the distress recoverable includes that arising from the unexpected termination of her pregnancy and the enduring of a miscarriage or stillbirth).

property. Over decades of struggle and progress, Maryland, like every state in the union, cast aside the harmful classification of people as property.[9] Pets should not be consigned to eighteenth-century notions of property. It denies the dignity abundantly ascribed to pets by society. It prevents people of Maryland from being made whole after a tragic injury or death of their pet.

The legal arc of Maryland is one of progress and bends inexorably towards greater recognition of rights. The common law designation of pets as personal property, rooted in legal formalism, conflicts with society's values and the trajectory of common law in Maryland and throughout the country. Our pets are more than just living beings. They are

_____

[9] History has taken a dim view on legal decisions that perpetuated the treatment of people as property merely because the law previously prescribed it. The United States Supreme Court infamously held in *Dred Scott v. Sandford*, "[b]ut it is too clear for dispute, that the enslaved African race were not intended to be included, and formed no part of the people who framed and adopted this declaration[.]" 60 U.S. 393, 410 (1857). The *Dred Scott* decision has been widely condemned and regarded as one of the most repudiated decisions by the United States Supreme Court. Robert A. Burt, *What Was Wrong with Dred Scott, What's Right about Brown*, 42 Wash. & Lee 1, 1 (1985) ("No [United States] Supreme Court decision has been more consistently reviled than *Dred Scott v. Sanford*.) This Court made the same mistake as the United States Supreme Court when it decided *Hughes v. Jackson*, 12 Md. 450 (1858) (recognizing Maryland's common law treatment of slaves as property, devoid of civil rights, including the right to sue or be sued).
While different in kind and degree, courts propagated the doctrine of coverture, which treated married women as quasi property of the husband. *R. & E. Builders, Inc. v. Chandler*, 144 Vt. 302, 304, 476 A.2d 540, 541 (1984) (describing "common law legal fiction that a husband and wife are one person for most legal purposes[]"). Notably, "a wife could not sue anyone for a tort committed against her without her husband's consent; neither could she be sued for committing a tort without having her husband joined as a defendant." *Id.* at 304, 476 A.2d at 541. Courts only gradually removed *de jure* subjugation of women from the common law in the twentieth century. *Trammel v. United States*, 445 U.S. 40, 52, 100 S. Ct. 906, 914 (1980) ("Chip by chip, . . . cast aside so that [n]o longer is the female destined solely for the home and the rearing of the family, and only the male for the marketplace and the world of ideas[]").

14

widely considered best friends, guardians, and members of the family.  Maryland law should recognize and bestow pets with the same degree of dignity.

## CONCLUSION

In this instance, it appears that pet owners who sustain the loss of the pet as the result of the grossly negligent acts of another will have no recourse other than with the General Assembly to move Maryland forward.

For these reasons, I dissent and would affirm the judgment of the Court of Special Appeals.

15